### W. C. MOORE v. THE STATE.

*No. 1232. Decided April 28th, 1897.*

**1. Indictment—Counts—Election—Charge Equivalent to.**

Where an indictment contains several counts, and the charge of the court submits only one or more, omitting and ignoring the others, this is equivalent to an election by the State to claim a conviction only upon the counts so submitted in the charge.

**2. Same—Election—When not Required.**

The State will not be required to elect between counts: (1) Where the same transaction is embraced in any number of distinct counts. (2) Where the same transaction or offense is charged in different counts, and each count alleges a different mode or means of doing the same act constituting the same offense. (3) Distinct ways of doing the same thing, not antagonistic to each other, may be alleged conjunctively in the same count; and, in such case, there can be, in the nature of things, but one count, and no election; and the prosecution has the right to proceed upon all the means alleged in the count.

**3. Same—Abortion.**

Where an indictment for abortion contains different counts alleging different means by which the offense was committed, e. g., that it was committed by drugs and by an instrument; and the evidence is, that both means were used in producing the abortion, the State cannot be required to elect between the counts; and, it is proper for the jury, in arriving at their verdict, to consider the proof under both counts.

**4. Abortion—Principals and Accomplices.**

Under our statute, in cases of abortion, the female cannot be a principal. The party prescribing and furnishing the medicine, etc., to a woman, for the purpose of producing an abortion, is a principal under Article 641, Penal Code. A party who

knows the object and purpose for which the medicine prescribed by a doctor, or the instrument, are to be used, and furnishes the same with such knowledge, would be an accomplice under Article 642, Penal Code.

### 5. Same—Evidence—Means Used.

Where one of the counts in the indictment alleged, that the instrument used was a penstaff, it was admissible to prove that other means, auxiliary to the penstaff, were used in penetrating the parts.

### 6. Same—Venue of the Prosecution.

On a trial for abortion, where it appeared that the means of producing the abortion were applied, and the acts performed, in one county, but the miscarriage occurred in another county, the venue of the prosecution was in the county, "in which the offense was committed," that is, where the acts were performed which resulted in the abortion. Code Crim. Proc., Art. 246. See, opinion for discussion in extenso, of this question.

### 7. Same—Examination of Prosecutrix as a Witness—Leading Questions.

On a trial for abortion, where it was objected, that leading questions were propounded by the prosecution to the prosecutrix, over defendant's objections. Held: This was a matter in the discretion of the trial court, and no error is shown where an abuse of the discretion is not manifested.

### 8. Same—Evidence—Motive and Intent.

On a trial for abortion, it was competent to prove by a blacksmith, that, shortly before the offense was committed, he, at the instance and under the direction of the accused, made a metallic instrument for the accused, though it appeared that the instrument had not been delivered to defendant before, nor used by him in the matter of producing the abortion. The evidence was admissible on the question of motive and intent on the part of defendant.

### 9. Abortion—Evidence Sufficient.

See, opinion for facts stated, upon which it is Held: The evidence is amply sufficient to support a judgment of conviction for abortion.

APPEAL from the District Court of Jack. Tried below before Hon. J. W. PATTERSON.

Appeal from a conviction for abortion; penalty, five years' imprisonment in the penitentiary.

The indictment charged appellant with producing an abortion upon one Mollie Smith, on the 20th day of February, 1897. It contained three counts, but the case was submitted to the jury only upon the first and third counts. The first count charged substantially that the accused administered to Millie Smith, a pregnant woman, with her consent, a drug and medicine calculated to produce abortion; and did procure the abortion by means of said drug and medicine. The third count charged appellant with making an assault upon Mollie Smith, a pregnant woman, and did unlawfully, etc., with her consent, thrust into her womb and private parts, a certain penstaff calculated to produce abortion, and did then and thereby procure an abortion by the said Mollie Smith.

Defendant moved to quash the first count, upon the ground, that, if defendant administered the drugs and medicines to Mollie Smith with her consent, then he would only be an accomplice, and could not be convicted under this count, it charging him as a principal. The motion to quash was overruled. Defendant then moved, after all the evidence had been introduced in the case, to have the State elect upon which count a

conviction would be claimed. This motion was also overruled by the court.

The evidence showed, that defendant had been a school teacher and Mollie Smith his pupil. That she was twenty years of age. That she went with defendant to Henrietta, in Clay County, to attend a teachers' examination, where she was an applicant for a second grade teacher's certificate, and that while there, at an hotel, defendant seduced her. That they continued to have intercourse until she became pregnant. In her testimony in regard to the use of the pen-staff upon her by the defendant, she testified, that the defendant used a metallic instrument to enlarge her vagina before he inserted the pen-staff. Defendant moved to strike out her testimony, because there was no allegation in the indictment, that a metallic instrument had been used in connection with the pen-staff. This motion was overruled.

The further facts in the case will be found sufficiently stated in the opinion.

*W. E. Taylor* and *Sil Stark*, for appellant.—The court erred in overruling defendant's motion to quash the first count in the indictment in this cause, because the proof all shows and the prosecuting witness swears, and is not controverted by any circumstance or proof, that the defendant only gave to and furnished her the drug and medicine; that she took it herself, that defendant was not present, and did not dose the medicine for her nor administer it to her; and the indictment also charges and alleges in this count that the drug and medicine was administered to Mollie Smith, the prosecutrix, with her consent; this being true, the defendant cannot be guilty on the first count of this indictment as a principal, but would only be guilty, if at all, as an accomplice. That he cannot be convicted as an accomplice upon an indictment that charges him as a principal. Penal Code, Art. 643; Willingham v. State, 33 Tex. Crim. Rep., 98; Wandell v. State, 25 S. W. Rep., 27.

The court erred in not compelling the State's Attorney to elect on which count of this indictment he would rely and ask for a conviction in this cause upon the written demand and request of the defendant after all the evidence had been introduced for the State, because said indictment contains three several and distinct counts, charging that defendant produced the abortion in three distinct and separate ways and means, and the court should have required the State to elect upon which count in said indictment it would rely for a conviction, thereby putting the defendant upon notice of what he was called upon to answer.

When indictment states three distinct offenses or offenses committed in three distinct ways neither of which enters into nor forms part of the other, the State should be compelled to elect upon which count it would proceed, as felonies arising from distinct transactions cannot be joined in the same indictment. McKenzie v. State, 32 Tex. Crim. Rep., 568;

Keeler v. State, 15 Tex. Crim. App., 111; Simms v. State, 10 Tex. Crim. App., 131; Bishop's Crim. Proc., § 448.

The court erred in refusing to withdraw from the consideration of the jury that part of the evidence of the prosecutrix, Mollie Smith, in which she stated that the defendant introduced or inserted into her private parts as an opener the metallic instrument and in connection therewith inserted the pen-staff into her womb or private parts, for the reason that the indictment in this cause charges the use of the metallic instrument and the pen-staff separately and distinctly; no where in the said indictment is the conjunctive or connective use of the metallic instrument and the pen-staff alleged, and the admitting and refusing to withdraw this testimony from the consideration of the jury was a prejudicial error to the defendant, and did him an irreparable injury in this cause.

The court erred in his charge to the jury in submitting the law as to the violation of both the first and third counts in the indictment in the same clause of his charge, and in instructing the jury that if they believed from the evidence beyond a reasonable doubt that defendant administered the drug or medicine or inserted the pen-staff, etc., they would find the defendant guilty, because said charge was not authorized by law, and was repugnant to the indictment in this: Indictment did not charge the conjunctive or connective use of the drug and medicine and the pen-staff, and this charge was repugnant to the indictment in this cause and did the defendant an irreparable injury.

The charge of the court should conform to the indictment. But when the indictment contains more than one count the court should not blend the same nor apply the facts proven disjunctively and especially where the transactions constitute separate and distinct offenses committed at separate places and at different times.

The court erred in refusing to dismiss this cause upon the charge of procuring the abortion, because the evidence and all the proof in this cause shows conclusively that if the prosecutrix, Mollie Smith, did abort as charged, she aborted in Montague County, Texas, on the 20th day of February, 1897, and did not abort in Jack County, Texas, and the venue in this cause as charged in the indictment was laid in Jack County, Texas, and the evidence does not prove the venue as laid or charged, and the court should have dismissed this cause in so far as it charged the procuring the abortion, for want of jurisdiction or venue, and the court should have instructed the jury to find a verdict of not guilty on the charge of procuring an abortion in Jack County, Texas.

The commission of an offense of the grade of felony must be wholly and entirely committed in the county where the venue is laid, unless it be an exceptional case provided for by statute, and procuring an abortion is not an enumerated exceptional case.

The evidence shows conclusively that thirty days after the use of any of the alleged means to procure the abortion the prosecutrix aborted in Montague County, about eight miles from the Jack County line at its nearest point. Williams v. State, 28 Tex. Crim. App., 301; Miles v.

State, 23 Tex. Crim. App., 410; Briggs v. State, 20 Tex. Crim. App., 106; Searcey v. State, 4 Texas, 450; Scott v. State, 31 Texas, 409.

*Mann Trice*, Assistant Attorney-General, for the State.—1. Appellant contends that the proof only shows that he was an accomplice and therefore no conviction could be had under the indictment charging him as a principal. The legal status or relation of the parties hereto, considered in connection with the definition of this offense, fixes the status of appellant as a principal, and the idea of his being an accomplice is necessarily precluded. An accomplice presupposes a principal; without a principal there can be no acccomplice. There is no pretense that any one acted in concert with appellant but Mollie Smith, the injured female. While she may be culpable morally, under our law she is not indictable for an abortion committed on herself. Art. 641, Penal Code, et seq., contemplates that drug or medicine shall be administered, or the violence used by a person other than the female upon whom the offense is committed. She is regarded as the victim rather than as the perpetrator of the crime, and in law is not regarded as either the principal or the accomplice. Watson's case, 9 Tex. Crim. App., 244; Com. v. Wood, 11 Gray, 35, quoted and approved in Watson's case. In Watson's case, supra, it is said, "that the court rightly instructed the jury that the woman was not, under the statute, technically an accomplice for she could not have been indicted with him for the offense. Nor do we believe she could have been indicted for the offense .under our statute, and this liability to indictment is a fair test of determining the legal relationship of the parties to the case and the perpetrator."

While culpable morally, as before stated, she is in law guilty of no offense. As said in Willingham's case, "She was the innocent agent; he was the principal, and was properly prosecuted as such." 33 Tex. Crim. Rep., 99.

Appellant seems to think, because he merely procured the drug, handed it to her and advised her to take it, and did not actually assist her or force her to take it, therefore he did not "administer" it to her. There is good authority sustaining the proposition that to deliver a drug, poison or medicine to another for the purpose of being used for abortion is to administer the same, within the meaning of statutes similar to ours. See, State v. Murphy, 3 Dutcher, N. J., 112-113; Blackburn v. State, 23 Ohio St., 146-150-162; Com. v. Galaran, 9 Allen, 274; Com. v. Berse, 108 Mass., 487; Bishop on Stat. Crimes, 747; Vol. 2, Bishop's Crim. Proc., 645.

As stated in Murphy's case, supra, "Nor does the statute make it criminal for the woman to swallow the potion or consent to the operation—no act of hers is made criminal by the statute. Her guilt or innocence remains as at common law. Her offense at common law is against the life of the child. The offense of third persons under the statute is mainly against her life and health. The statute regards her as the victim, not as the criminal; as the object of protection rather

than of punishment. * * * The third party who administers the potion or instigates it being taken, is the only offender recognized by the statute." Therefore, if this conviction could be referred to the first count in the indictment, the evidence is sufficient to constitute appellant a principal as distinguished from an accomplice as applicable to this peculiar offense and the procuring of the medicine and his advice to her to take it, and its delivery to her, should be held administering of the same, within the meaning of Art. 641, Penal Code. If the abortion was the result of the force used by means of the metallic instrument or the penholder, or both, as charged in the second and third counts of the indictment, then there can be no question as to the appellant being a principal, as the proof shows he actually applied the force and means charged in the indictment.

2. Appellant contends that the court should have sustained his motion to require the State to elect upon which count of the indictment it would rely for a conviction. In support of this proposition, he cites 32 Tex. Crim. Rep., 568; 15 Tex. Crim. App., 111; 10 Tex. Crim. App., 131; Bishop's Crim. Proc., 448.

The case of McKenzie v. State, 32 Tex. Crim. Rep., 568, seemingly sustains appellant's general contention in this regard, but when the facts of this case are compared with this record, it is obvious that the rule requiring an election should not be invoked as to this transaction, for the reason that this indictment charges but one felony, the different counts only charging different means of accomplishing the one act— abortion. The means charged were all in furtherance of one object on the same subject, and when consummated, could only constitute one felony. There were separate and distinct felonies, as well as transactions charged in McKenzie's case, hence the court should have required the State to elect as to which count or transaction is relied upon. In this case there is no effort made to convict of more than one felony, and the conviction upon one count or either count in the indictment would bar a prosecution based upon either of the other counts, for the reason, that they all relate to and form part of the same general transaction, and when considered separately or collectively show but one offense, that is, abortion committed on Mollie Smith.

It is said in Keeler v. State, 15 Tex. Crim. App., 114: "The principle is that the court should always interpose, either by quashing the indictment or by compelling an election, where an attempt is made, as manifested by either the indictment or the evidence, to convict the accused of two or more offenses growing out of distinct and separate transactions; but should never interpose in either mode, where the joinder is simply designed and calculated to adapt the pleadings to the different aspects in which the evidence on the trial may present a single transaction."

3. The proof of venue as presented in the record is sufficient. No question is made but what the medicine was administered and the force

applied to the person of Mollie Smith in Jack County.   Ashlock v. State, 16 Tex. Crim. App., 13.

Venue properly laid where the blow was struck or injury inflicted. 1 Bishop's Crim. Proc., 52, 57; 9 Hump., 646; 21 Minn., 369; 16 Kan., 475.

4.   As appears from the testimony of the experts, there is no fixed time when the expulsion of the foetus would follow the acts which actually produced such result.   It is therefore clear that the acts of the appellant may have been the direct and proximate cause of the abortion. If so, the evidence is sufficient.   Positive evidence of the abortion, that is, the expulsion of the foetus or the formation from the womb, may occur sometimes after the performance of the acts which were the direct and proximate cause.   The circumstances of this case point to the theory that the abortion had been accomplished, that is, the foetus killed, long before its expulsion from the womb.   The condition of the foetus when examined by the witnesses soon after the expulsion, justify such conclusion.

Venue difference between thing done and mere evidence of it.   Here it is contended that the full act or crime was complete in J. County and the expulsion from the womb in M. County, only evidence of it.   In such case venue is J. County.   Bishop's Crim. Proc., 51.

As to different transactions being proved, and refusal of the court to require the State to elect, see, King's case, 35 Tex. Crim. Rep., 472.

HENDERSON, JUDGE.—Appellant was convicted of abortion, and his punishment assessed at confinement in the penitentiary for a term of five years, and prosecutes this appeal.   The indictment was in three counts.   The first count charged that appellant committed the abortion by the administration to the prosecutrix, Mollie Smith, of a drug and medicine; and the second count charged that appellant committed an abortion upon said prosecutrix by means of forcing into her womb and private parts a certain metallic instrument, calculated to produce abortion, etc.; and the third count charged that appellant committed an abortion upon the prosecutrix by means of inserting into her womb and private parts a certain pen-staff—an instrument calculated to produce abortion.   All of said counts charged that the means were used with the consent of the prosecutrix.   The court, in his charge to the jury, submitted only the first and third counts, which was tantamount to a dismissal of the second count, to-wit: the court charging an abortion by means of the use of a metallic instrument; that is, it was equivalent to an election on the part of the State to only prosecute on the first and third counts.   See, Smith v. State, 34 Tex. Crim. Rep., 123; 1 Bishop's Crim. Proc., § 1015, subsections 2, 4.   On the conclusion of the evidence, appellant made a motion requiring the State to elect upon which of said counts it would prosecute.   This was refused, and the action of the court therein is assigned as error.   It is insisted that said two counts set out distinct and different transactions, and that in such case the

proper practice is to require the State to elect; and it is further insisted that the refusal of the court to so require the prosecution to elect on which count it would insist for a conviction of the appellant was calculated to, and did, injure him. In this connection, we are referred to the following authorities: Simms v. State, 10 Tex. Crim. App., 131; Keeler v. State, 15 Tex. Crim. App., 111; and McKenzie v. State, 32 Tex. Crim. Rep., 568. The first of said cases was a conviction for murder, the appellant being indicted in the first count as a principal, and in the second count as an accomplice. The court in that case held that these were two distinct transactions, and in such case the State should have been compelled to elect. We do not understand such to be the correct rule of law, or that this court would now hold that the doctrine of election applied in such case. See, Shuman v. State, 34 Tex. Crim. Rep., 69; Smith v. State, 34 Tex. Crim. Rep., 123; Dill v. State, 35 Tex. Crim. Rep., 240. In Keeler's case, supra, the question was not before the court; and the question of counts and election is only discussed in a general way, and certain character of cases are cited in which counts may be joined in the indictment, and certain character of cases stated in which an election will not be required. We do not understand anything said in that case to be applicable to this case. Nor was the question a practical one in McKenzie's case, supra. In this case the chrage was theft, and in each of the four counts of the indictment the same property was alleged to have been stolen. In the first and second counts the theft was alleged to have been committed in New Mexico—in the first count the property alleged to be brought into Martin County, and in the second count into Terry County. The fourth count alleged the theft to have been committed in Andrews County; and the third count alleges the theft to have been committed in Terry County, then attached to Martin County for judicial purposes. The court, in passing, states that some of these counts appear to have been upon distinct transactions from the others and proceeds to state that when, upon a trial, distinct transactions are developed, at the request of the defendant, the State should be forced to elect upon which count the prosecution will proceed (such a request, however, was not made in the case); and then the court proceeds to remark: "We have mentioned this subject solely for the purpose of preventing mistakes in the future." So, it will be seen that the question was not really before the court. We are disposed to question the above statement as to said counts involving different transactions, the only difference being that the offense was alleged to have been committed at different places, it being otherwise the same offense and transaction. We understand the rule to be that the indictment can charge the same offense or transaction in any number of distinct counts, and in such case the State will not be driven to an election. If distinct offenses are charged in different counts in the same indictment, the State may be required to elect. See, Pisano v. State, 34 Tex. Crim. Rep., 69. If the same transaction or offense is charged in different counts, each count alleging a different mode or means of doing the same act consti-

tuting the offense, the State will not be required ordinarily to elect. See, Smith v. State, 34 Tex. Crim. Rep., 123; Willis v. State, 34 Tex. Crim. Rep., 148; Dill v. State, 35 Tex. Crim. Rep., 240, and Shuman v. State, 34 Tex. Crim. Rep., 69. In Willis v. State, supra, it was held (which follows the current of authorities in this State) that distinct ways of doing the same offense, not antagonistic to each other, may be set forth conjunctively in the same count; and in such case there can be, in the nature of things, but one count, and no election, but the prosecution proceeds on all the means alleged in the count. In Tabler v. State, 34 Ohio St., 127, it was held that where there were two counts in an indictment, one charging feticide by means of the administration of drugs, and the other charging the same offense by the use of instruments, not only could the prosecution proceed on both counts, but that, where the proof left it uncertain as to whether the feticide was caused by one or both means, the jury could consider both means, as alleged in the two distinct counts, and the court refused to give a charge presenting the contrary view. The court say upon this question of counts: "Where the several counts in the indictment are not only properly joined, but also are of such a character that it would be an abuse of discretion to compel the prosecuting attorney to elect upon which the trial shall proceed, that it can proceed upon both." In considering the refusal to give the charge requested by the appellant in that case, the court uses the following language: "The next question is, did the court err in refusing to charge that the abortion was the result of drugs and instruments combined, and was not solely the result of either? The statute makes feticide, by administering a drug, or by using an instrument, a crime, and makes no express provision where the destruction of the fœtus results from their combined effect. It by no means follows, however, that, where the destruction of the fœtus results from their combined operation, no crime, under the statute, is committed. Each of the counts in this indictment charged the same feticide. In the first it was charged to have been caused by means of an instrument, and in the second by means of a drug. That these counts were properly joined is not disputed. Whether a third count, charging the destruction of the fœtus by the combined use of an instrument and a drug, would have been good, may be seriously doubted, no such means being named in the statute; but, if good, it conclusively shows that, under one or both of the counts of this indictment, a conviction might be had, upon proof that the feticide was the result of the combined effect of both causes. It is only necessary now, however, for us to show that it was not essential to a conviction under either of the counts that the destruction of the fœtus was caused solely by the means described in such count." To the same effect, see, Com. v. Brown, 14 Gray, 419; Com. v. Thompson, 159 Mass., 56, 33 N. E. Rep., 1111. The proof on the part of the State shows that the appellant administered to the prosecutrix, Mollie Smith, certain drugs for the purpose of procuring an abortion, and also, during the time she was taking the

drugs, that he performed an operation on her with an instrument alleged in the indictment. The proof shows that the prosecutrix aborted a short while after these means were used. The proof on the part of the State leaves it uncertain whether the prosecutrix aborted from one or the other of the means alleged, or she may have aborted from the combined use of both means. There was but one abortion. That was the transaction upon which appellant was being prosecuted, and in our opinion, under the facts of this case, the court acted properly. Indeed, it would have placed the State at a great disadvantage had it been required to elect upon which count it would prosecute; and, under the circumstances of this case, it was proper for the jury, in arriving at their verdict, to consider the proof under both counts. Appellant contends that the court erred in submitting the first count to the jury at all, inasmuch as he insists that the proof showed that appellant did not administer the drugs himself, but furnished the same to the prosecutrix; in other words, that he was indicted as a principal in said count, and the proof showed that defendant was only an accomplice. In support of this proposition, we are referred to Penal Code, 1895, Art. 642, and to Willingham v. State, 33 Tex. Crim. Rep., 98, and Wandell v. State (Tex. Crim. App.), 25 S. W. Rep., 27. Article 641, Penal Code, 1895, is as follows: "If any person shall designedly administer to a pregnant woman, with her consent, any drug or medicine, or shall use towards her any violence or any means whatever, externally or internally applied, and shall thereby procure an abortion, he shall be punished by confinement in the penitentiary, not less than two nor more than five years." Article 642: "A person who furnishes the means for procuring an abortion, knowing the purpose intended, is guilty as an accomplice." We do not understand that the authorities cited support the contention of appellant's counsel. The case of Willingham v. State, supra, appears to hold the contrary. We understand the court in that case to hold that Miss Brown, the prosecutrix, could not be a principal under our statute, and that, consequently, the appellant in that case could not be an accomplice as to her. The reason of the opinion in the Willingham case is as follows: It is a well-settled rule at law that there can be no accomplice without a principal. Our law does not hold the woman, whether she consents or not, a principal. She is guilty of no crime known to the law. Now, to hold that the party who prescribes and furnishes to the woman the medicine with which to effect the abortion is an accomplice, would be to change the well-settled rule of law. Who would be his principal in the case? No one. We cannot have an offense that could be committed by an accomplice without a principal. We therefore hold that where one prescribes the medicine, and furnishes it to the woman for the purpose of creating an abortion, he is a principal, and that Article 642 has reference to a case in which the principal is furnished the means with which the abortion is committed. To illustrate, the doctor prescribes the medicine, or desires an instrument furnished to be used by the woman. He furnishes

the medicine to the woman, and furnishes the instrument to be used by her, and directs her how to use both. Now, we hold that he is the principal, because the woman cannot be. If a person knows the object and purpose for which the medicine prescribed by the doctor or the instrument are to be used, and furnishes the same with such knowledge, he would be embraced under Article 642, and would be an accomplice. See, Com. v. Brown, 14 Gray, 419. As to appellant's contention that the court erred in submitting the third count in the indictment to the jury, charging an abortion to have been committed by means of a penstaff, because, as he insists, the proof did not show that the only instrument used was the penstaff, but that it was used in connection with a certain metallic instrument, the record shows that the metallic instrument was merely used to open the parts, so that the womb could be penetrated, and the sack that held the fœtus punctured with the penstaff. If this contention being sound, then, the pleader having failed to charge that the appellant used his hands in order to effect his purpose, it would not be competent to prove that he did use his hands. The fact that, in conjunction with the main instrument used, something else was done or used was competent to be shown. There was no variance here between the indictment and the proof. The proof showed that he inserted the penstaff, and the fact that he used something else as auxiliary thereto to enable him to make penetration is immaterial.

The prosecution in this case was in Jack County. The indictment was presented in that county, and alleged that the offense was committed in said county. The proof showed that the means used to procure the abortion and all that was done by appellant was done in Jack County. The proof further shows that the prosecutrix, Mollie Smith, aborted in Montague County. In this state of case, appellant insists that the District Court of Jack County had no jurisdiction of the consummated offense. Appellant urges that, there being no special statute on the subject giving jurisdiction in a case of abortion where the acts were performed or where the abortion took place, it is governed by our general statute on the subject, which is as follows (Art. 246, Code Crim. Proc., 1895): "In all cases, except those enumerated in the previous articles of this chapter, the proper county for the prosecution of the offense is that in which the offense was committed." And he insists that the offense was not committed until the abortion took place; that this was the consummation of the offense; and that it occurred in Montague County; and that Jack County had no jurisdiction. We are referred to a number of cases. All of them are simply to the effect that the prosecution must be in the county where the offense was committed, but none of them are in point or illustrative of this case. It is earnestly insisted that Searcy v. State, 4 Texas, 450, is in point. As we understand that case, the question here presented was not at all before the court there. That was a case of theft, in which there was no venue alleged. The court, in passing, however, say that at common law (quoting from Chit., Crim. Law, p. 177) "the venue should always be alleged in the county

where the offense is committed. Where the offense was committed in one county, and consummated in another, the venue could be laid in neither county, and the offender went unpunished." We will hereafter consider how this question was at common law. All the decisions of our own courts on this question of venue agree that our statute is obligatory, and that the offense is punishable in the county where committed, except as provided by special statutes. The difficulty has been in applying the rule laid down in the statute. In Robberson v. State, 3 Tex. Crim. App., 502, which was a case of a fraudulent disposition of mortgaged property, it was held that the venue of the offense was where the property was disposed of. In Sims v. State, 28 Tex. Crim. App., 447, which was a case of swindling, it was held that the offense was not committed until the property was acquired. The false pretenses were made in one county, and the property acquired in another. It was held that the latter county had jurisdiction. In Abbey v. State, 35 Tex. Crim. Rep., 589, which was a case of theft by a bailee, the property being hired in one county, and disposed of in another, it was held in such case, under the terms of the statute, that the disposition or the conversion was the consummation of the offense, and that was the county in which the venue should be laid. We can see very clearly from these cases that there was no offense until the final act, and that the defendant in each case was present at and doing the act which consummated the offense. There is more difficulty in the application of our statute to this offense than in the cases noted. There was no abortion in Jack County, for this occurred in Montague County, when appellant was not present, and what he did to procure the abortion occurred entirely in Jack County. While we are controlled in this matter by our statute, the common law may aid us in determining how this matter was regarded; that is, as to where the offense was regarded as committed, when all that was done by the defendant occurred in one county, and the consummation took place in another. As stated above, our Supreme Court, although the question was not before them, in passing, stated that "the rule at common law was, where an offense was committed in one county, and consummated in another, the venue could be laid in neither; and the offender went unpunished." In that view, we believe, they were mistaken. Mr. Chitty, the author referred to by that court, uses the following language: "And thus, also, if the mortal blow was given in one county, and the party died in consequence of the blow in another, it was doubted whether the murder could be punished in either, for it was supposed that the jury of the first could not take notice of a death in the second, and the jury of the second could not inquire of the wound in the first." Chit., Crim. Law, p. 178. Mr. Wharton, in his Criminal Law (Vol. 1, § 292), on this subject, uses the following language: "By the early English common law, the place in which the mortal stroke was given had jurisdiction in cases of homicide. As there seemed, however, to be doubts in cases in which the blow was in one jurisdiction, and the death in another, the statutes of 2 & 3 Edw. VI., chap. 24, were passed, the ef-

fect of which is to give the place of death jurisdiction." He further says: "This statute has been held to be a part of the common law in several States of this country, but, even where it is in force, it does not, according to the better opinion, divest the jurisdiction of the place where the blow was struck." To the same effect, see, U. S. v. Guiteau, 1 Mackey, 498; 10 Fed., 161 (reported in 3 Crim. Law Mag., 680). Guiteau was convicted of murder, and applied to Judge Bradley for a writ of habeas corpus, the main ground of his contention being that the court of the District of Columbia had no jurisdiction, because President Garfield died in New Jersey. We quote the following from the opinion of Judge Bradley: "By the strict technicality of the common law, this position would probably be correct, although Lord Chief Justice Hale, the greatest criminal lawyer and judge that ever lived, uses the following language: 'At common law,' says he, 'if a man had been stricken in one county, and died in another, it was doubtful whether he were indictable and triable in either, but the more common opinion was that he might be indicted where the stroke was given, for the death was but a consequence, and might be found, though in another county; and, if the party died in another county, the body was removed into the county where the stroke was given, for the coroner to take an inquest super visum corporis.'" Mr. Chitty does not state the proposition that the party could not be convicted in either jurisdiction, but states that it was doubtful. Here we have from Lord Chief Justice Hale the statement: "The more common opinion was that he might be indicted where the stroke was given, for the death was but a consequence." In Rex v. Hargrave, 5 Car. & P., 170, it was held that the blow causing the death was the offense, and this gave jurisdiction to the county where the blow occurred. In State v. Kelly, 76 Me., 331, which was a case where a mortal blow was struck in a fort over which the United States had jurisdiction, and the deceased died outside of the fort, in the State of Maine, it was held that the State of Maine had no jurisdiction. The court, in commenting upon this proposition, used the following language: "The modern and more rational view is that the crime is committed where the unlawful act is done, and that the subsequent death, while it may be sufficient to confer jurisdiction, cannot change the locality of the crime." To the same effect, see, Green v. State, 66 Ala., 40. All of these cases appear to indicate the rule at common law, and show that the offense was regarded as committed where the blow was struck or the acts performed, although the final result which consummated the offense did not happen until afterwards, and in another jurisdiction. It appears that the doubt was not in regard to the jurisdiction of the county where the mortal wound was inflicted, but as to the jurisdiction of the county in which the death ensued, and that the Act of 2 & 3, Edw. VI., above referred to, was for the purpose of giving the county of the death jurisdiction also of the offense. See, Nash v. State, 2 G. Greene (Iowa), 286; Riggs v. State, 26 Miss., 51; Stoughton v. State, 13 Smedes & M., 255; People v. Gill, 6 Cal., 637; State v. Gessert, 21 Minn., 369. The lan-

guage in the latter case is so apropos to the case before us that we quote the decision in full, together with the authorities cited: "The indictment in this case was found by a grand jury of Washington County, and charges the defendant with committing the crime of murder, by feloniously, etc., inflicting upon David Savazyo, on August 28, 1874, in said county, a stab and wound, of which, upon the same day, Savazyo died, in the County of Pierce, and State of Wisconsin. The question in the case is whether the indictment charges the commission of an offense in the County of Washington. It is for his acts that defendant is responsible. They constitute his offense. The place where they are committed must be the place where his offense is committed, and therefore the place where he should be indicted and tried. In this instance the acts with which defendant is charged, to-wit: the stabbing and wounding, were committed in Washington County. The death which ensued in Pierce County, though it went to characterize the acts committed in Washington County, was not an act of defendant, committed in Wisconsin, but the consequence of his acts committed in Washington County, against the peace and dignity of the State of Minnesota. We are therefore of opinion that the indictment charges the commission of the crime of murder in Washington County, and, upon the questions certified to this court by the court below, that the demurrer to the indictment should be overruled. Riley v. State, 9 Humph., 646; Com. v. Parker, 2 Pick., 550, 559; 1 East, P. C., chap. 5, § 128; Rex v. Burdett, 4 Barn. & Ald., 95, 173; Grosvenor v. Inhabitants, etc., 12 East, 244; People v. Gill, 6 Cal., 637; State v. Carter, 27 N. J. Law, 499; 1 Hale, P. C., chap. 33; 1 Bishop's Crim. Law, § 83; 1 Bishop's Crim. Proc., § 67; 2 Whart., Crim. Law, § 1052." Now, both upon reason and authority, it occurs to us that the offense charged in this case was committed in Jack County. The defendant procured the drugs and administered the same to the prosecutrix in Jack County. He procured the instruments and performed the operation on the prosecutrix in Jack County. All that he did to produce the abortion of the prosecutrix was done by him in said county. The final consummation of the offense occurred in Montague County, but the sole cause of this was set in motion by appellant in Jack County. The causes which produced the effect all occurred in Jack County—that is, the appellant put in operation a force in one county, which produced its results in another; and we hold that he is responsible in the forum where he performed the acts which resulted in the abortion. Appellant took a number of bills of exception to the mode of examining the prosecutrix by the State, on the ground that the questions were leading. Some of these questions do appear to be leading, but an examination of a witness in this regard is much in the discretion of the trial judge; and, unless the mode should appear to have worked to the injury or prejudice of the appellant, the action of the lower court will not be revised. It does not appear that the discretion of the trial judge was abused, or that any injury resulted to the appellant. Several bills of exceptions were taken to the

admission of testimony. We have examined the same, and in our opinion the testimony was admissible. In regard to the testimony of the blacksmith, to the effect that he made a pair of tweezers, or some such metallic instrument, at the instance of appellant, and that he exhibited the same to him on the 18th of January, and the defendant gave him further directions as to how to complete the same, we believe same was admissible, although appellant never procured said instruments, and did not use them on the prosecutrix. They were admissible for the purpose of showing his intent in the matter of procuring an abortion. Appellant urges that this case should be reversed, because the testimony is not sufficient to sustain the verdict. To present this matter clearly, we will state those portions of the evidence tending to show that the abortion was produced by the means used by appellant. In this connection, we will assume the facts, as proved—that appellant furnished to the prosecutrix, Mollie Smith, beginning about the 1st of January, 1897, a bottle of compound of cotton root and oil of rue, prescribing the doses to be taken by her; that she took one teaspoonful of the same three times a day from the 1st of January until the 15th of January, 1897; and, beginning on the 15th day of January, she took thirty drops of ergot three times a day for three days, which had also been given to her by the defendant. She took then, for one day, three teaspoonfuls of the first compound three times a day. She took no more medicine after this. On the 21st day of January, appellant performed the operation on her; that is, he inserted into her private parts a metallic substance, which he used as an opener, and, in connection with this, he inserted a penstaff, about seven inches long, and rounded at the end, into her private parts. She stated that this operation gave her pain, and that for a short time she felt sick and faint, but it soon passed off. The penstaff, when it was withdrawn, was wet. We will also assume, as proved, that the prosecutrix aborted on the 20th of February, 1897; that is, a fœtus, as stated by the witnesses, from three to four inches long, and partially developed, was expelled from her womb. This fœtus, as stated by the witnesses, had a head about the size of a partridge egg. It had partially developed legs, arms, fingers, and toes, and indications for eyes. We will also assume, as proved, that after the operation, which was performed on the prosecutrix about two miles from her home, she walked home. That night she was questioned by her father, and she told all that had occurred. He became angered, jerked her by the shoulders, and shook her, and struck her three times on the side of the head. She was greatly troubled at this time, and mentally depressed and despondent. On January 23rd she rode in a wagon from her father's house to a point about six miles distant, and returned, the road being through a timbered and rough rocky country. On February 6th she rode in a buggy with springs a distance of twenty-four miles, from her father's house to her brother's house, in Montague County. This road was over quite a hilly country, and three or four miles of the same was quite rough and rocky. She also drew some water out of a deep well while she was staying at her

brother's place (how many buckets is not stated), and did some washing there. About the 15th of February she had a flow of blood, which lasted until the 19th of February, when she suffered considerable pain. These pains were between midnight and day. On the next day she states that she found something in her clothes. She got up from the bed, and walked outdoors, while the rest of the family were at dinner, and went to the northeast yard fence, and there something dropped from her clothing, which she left there, and returned to the house. Her sister-in-law went to the fence shortly afterwards, and discovered the foetus, took it, and carried it into the house, where it was subsequently examined by herself and husband, and by a Mrs. Craig. A number of physicians were examined. They each speak of the first preparation given to the prosecutrix as an emmenagogue, and say that it is used for the purpose of bringing on suppressed menses. Dr. Walker says: "Its effect is to excite the atonic powers of the muscular membranes. and fibers of the womb, thus causing them to act more freely. The dose as given in the prescription was one to two teaspoonfuls daily. It excites or brings about, or has a tendency to bring about, the monthly flow in cases of suppressed menses, occasioned by cold, ill health, or other causes. As to its abortive power, an emmenagogue in general possesses very slight abortive powers, unless given in heroic doses, and then their action is very uncertain. I would not consider it safe to prescribe the medicine in this prescription to a pregnant woman. It might possibly produce an abortion. If given in doses of three teaspoonfuls daily, it would not be liable to produce an abortion, because thus given, three times a day, the effect of the first dose would, comparatively speaking, be gone before the second dose was taken. If a pregnant woman would take this prescription three times daily from the first week after Christmas up to four or five days of the 20th of January following, and should then take ergot three times daily, thirty drops at a dose, for three days, and then take of this original prescription three teaspoonfuls at a dose, and three doses per day for one day, I would look for an abortion. And, if the abortion occurred from this means, it would take place in twenty-four, thirty-six, or possibly seventy-two hours, and not later than that. If taken this way, in connection with the ergot, as described, and in such heroic doses, it would likely produce an abortion sooner than if taken in doses of three teaspoonfuls daily. If it produced an abortion at all, it would certainly have produced it in three or four days. If this medicine had produced an abortion, hemorrhage would have set in within seventy-two hours. I would also look for other alarming symptoms at once. If this medicine had been given as described, and the instruments had been used as described, I don't think it is at all probable that abortion could occur as late as thirty days after their use, but it might possibly do so. Mental depression, despondency of mind, in connection with the father's anger, and his shaking her by the shoulder, and slapping her three times on the side of the head, was calculated to produce an abortion. Riding in the wagon as described, and washing

and drawing water as described by the witnesses, was calculated to produce an abortion." Dr. J. W. Wade states: "If this prescription was taken in doses of one teaspoonful, three times daily, at morning, noon, and night, by a pregnant woman, for fifteen or twenty days, and then leave it off, and take instead thirty drops of ergot, three times a day for three days, and then take of the first medicine three teaspoonfuls at a dose, and three doses for one day, if the drug was pure, I would look for an abortion. I would look for this to occur from twenty-four to seventy-two hours after taking. It is not impossible for an abortion to occur as late as thirty days after taking the medicine as stated. The effect of the compound in the prescription is to produce abortion, either by uterine contraction or by strangulation of the embryo, by depressed circulation; and in this latter case the embryo might not be expelled for thirty days, but in this case the growth of the embryo would be retarded. An embryo of two months' age is about two or two and one-half inches long, and an embryo of three months' age is about three or three and one-half inches long The use of the penstaff as described might or might not produce an abortion. And, if it did so, it would be more likely to produce it immediately than the medicine. Mental depression and despondency of mind, in connection with the treatment the woman received from her father, as described by the witnesses, would be liable to produce an abortion." Dr. J. W. McComb states: "The prescription as taken by the prosecutrix is sometimes used by physicians to reinstate suppressed menses, and to regulate the flow, but I speak of this medicine theoretically as an abortifacient. It would be dangerous to give this medicine to a woman two and one-half or three months advanced in pregnancy in doses as per this prescription; and it would be still more dangerous to give it in teaspoonful doses three times a day. Its effect is to produce uterine contraction, and thus cause abortion. The effect of ergot is to cause uterine contraction, and also to diminish the embryonic circulation, and by either effect destroy the vitality of the embryo, and abortion would result. Ergot is the most powerful abortifacient known to the profession. If a woman advanced two or three months in pregnancy was to take the compound in prescription, in doses of one teaspoonful three times a day, for fifteen or sixteen days, and then take ergot in thirty-drop doses, three times a day for three days, and then take the compound in said prescription in doses of three teaspoonfuls, three times a day for one day, it would be likely to produce abortion. The abortion would most probably occur from twenty-four to seventy-two hours, though it might not occur for thirty days, or even longer. Where abortion is produced by diminishing the embryonic circulation, it will more probably be longer in occurring than by uterine contraction. If the vitality of the embryo is destroyed without bringing on uterine contraction, it would not be improbable that it would occur as long as thirty days off. In cases where hemorrhages occurs in threatened abortion, the growth of the fœtus would be retarded in proportion to the amount of the hem-

orrhage.   Medicine of the kind stated, and given as stated, might produce abortion by general depletion and debility of the system as an indirect effect of the medicine, and in such cases there would probably be growth of the embryo or fœtus.   A three months embryo is three to three and one-half inches, and has legs, arms, feet, and hands, eyes, and mouth.   The size given of the embryo is normal.   There are exceptions, either larger or smaller.   A pen-staff as described by the witness, Mollie Smith, might be inserted into the womb, and an abortion might be produced.   If the pen-staff was inserted into the womb sufficiently to produce an abortion, it might be done without producing blood at the time of the insertion.   A pen-staff inserted into the mouth of the womb would not necessarily produce an abortion.   The sack containing the amniotic liquid might be pierced, and let off a part or all of same, and produce an abortion, without causing hemorrhage at the time of the operation; and, if only part of the liquid was withdrawn, there might not be abortion for some time afterwards, and growth of the embryo in the meantime would be somewhat retarded.   Some pregnant women do have discharges of blood at intervals during gestation.   There is sometimes in duration and quantity what appears to be the usual flow at the next monthly period, and no flow after that time.   In cases of abortion there might be a slight hemorrhage eight or ten days before abortion, and then no flow for a few days, or even for a week or longer, and then hemorrhage begin, and continue until the abortion occurs.   If abortion was produced by the taking of the medicine, as testified to by the witnesses, and the use of the instruments, as testified to by them, or by either of said causes, it would probably be produced from twenty-four to seventy-two hours after the medicine was taken. This would be the rule in ordinary cases.   Mental depression and despondency of mind, together with the anger demonstrated by her father, and his shaking her by the shoulder, and slapping her three times on the head, as testified to by the witnesses, was liable to produce abortion.   The riding in a wagon, as testified to by the witnesses, is also calculated to produce an abortion.   The riding in a buggy, as described by the witnesses, was calculated to produce an abortion.   The washing and drawing and carrying water as described, was calculated to produce the abortion."   It will be noted that all of the physicians examined speak of the medicines as abortifacients.   They speak of the cotton root and oil of rue as an emmenagogue; but they state that, when given in larger doses, it is calculated to produce an abortion.   Its effect is to excite the powers of the muscular membranes and fibers of the womb, thus causing them to act more freely, and to produce uterine contraction. They attribute the same effect to ergot, and that its effect also is to diminish the embryonic circulation, and, both by contraction and diminution of circulation, to destroy the vitality of the embryo.   Ergot is generally used as a drug for the purpose of producing abortion; and the medical authorities speak of it as such, though some of them doubt its effect for this purpose.   See, Forensic Medicine and Toxicology, by J.

Dixon Mann, p. 122, and 3 Whart. & S. Med Jur., § 85. The latter authority uses the following language: "Most authors assert that there are no specific medicinal substances by which abortion can be produced. The only drug which has any claim to be considered as a specific in its action upon the uterus is the ergot of rye. Some writers allege that it is only capable of increasing the energies of the uterine contraction when these have already begun, and deny to it the power to originate them. We need, however, in this place, only show that it has this power." And he then proceeds to cite a number of cases from different physicians in which, by the administration of ergot, a large percentage of miscarriages or abortions were produced. As to the mechanical conditions, to-wit: the insertion of the penstaff, in the manner sworn by the witness, all of the physicians speak of it as a method to procure abortion, and all of the authorities agree that if this operation is well performed—that is, if the sack is punctured by the instrument—this is one of the surest methods of securing an abortion. The hypothetical case predicated upon the testimony of the witness was put to each of the expert physicians, and each answered that if a pregnant woman, two or three months in a state of pregnancy, would take the prescription No. 13,494, containing cotton root and oil of ruc, a teaspoonful three times a day, at morning, noon and night, for fifteen or twenty days, and then leave it off, and take instead thirty drops of ergot three times a day for three days, and then take of the first medicine three teaspoonfuls at a dose, and three doses for one day, they would look for an abortion to occur. They each state that they would look for this abortion, in the natural course of events, from twenty-four to seventy-two hours thereafter; but, however, they each state that an abortion from this means might occur as late as thirty days thereafter, and sometimes even longer. They each state that the use of a penstaff as described might produce an abortion; but they would look for it earlier than thirty days, but that it might occur as long as thirty days after the operation. They all state that they would look for the growth of the embryo to be retarded by the effect of either the medicine or the abortion; that is, that the fœtus would not have, after the administration of the drugs or the operation by the instrument (if it was effected by either or both), that healthy growth that it would otherwise have had. The witnesses who speak of the size of the fœtus state that, when they examined it (which was several hours after it had been expelled), it appeared to be three or four inches long, and appeared to have the formation of a head, body, with arms, legs and hands. No measurement appears to have been taken of it, but they speak of it merely from observation. The physicians testified that a fœtus two months old is from two to two and one-half inches long; one three months old is from three to three and one-half inches long. The authorities agree that this statement is as to the normal size, but they state that there is no fixed rule; that the fœtus, like children when born, vary in size. We have no proof in the record as to the size of the putative father or

mother of this embryo; nor have we any statement as to her physical condition, whether she was a stout, healthy woman, or otherwise. Now, upon this statement, the question presents itself whether or not the proof is sufficient to sustain the verdict; that is, whether it is reasonably certain that the abortion is to be attributed to the drugs or to the instrument used, or the combined effect of both. In this connection, also, we must look to the proof offered on behalf of the defendant that the prosecutrix was angrily slapped by her father on the night of the 21st of January, and that she rode on two occasions, in a wagon or buggy, between the 20th of January and the 21st of February, some distance over rough ground, and that she drew some buckets of water, after arriving at her sister's, out of a deep well, and carried the same some distance to the house. With reference to these latter causes, it occurs to us that considering the proportion of miscarriages by women engaged in the ordinary affairs of life, and regarding the prosecutrix, as the proof indicates, as an ordinary healthy country girl, they are not worthy of much consideration. We would not characterize them as entirely trivial; yet they do not impress us as entitled to much weight. The prosecutrix herself makes no complaint of these matters, and it would seem, if she was affected thereby, we would have heard something of these matters affecting her in the testimony. If there were no other potential causes operating upon her to produce a miscarriage, we might be inclined to attribute the abortion to these; but the evidence in this case shows beyond question that, so far as medical science can tell us, the most powerful abortifacients had been administered to her, and in Herculean doses; not only so, but the best mechanical means (we do not mean to say the best skill) known to science to produce an abortion was used upon her. She states that the appliances caused her pain in her parts, and that the instrument used indicated signs of penetration. The only difficulty presented is the remoteness of the result from the operating causes; for all of the physicians agree that the means used were eminently adapted to produce abortion, and they looked for it to occur much sooner. However, they agree in stating that it might have occurred later, as late as thirty days after the administration of the medicines and the operation with the instrument. The mere fact that it did not occur earlier cannot have the effect of attributing the abortion to any other cause, especially when the supervening causes suggested are of the character as above indicated. In our opinion, the only natural, reasonable, and logical conclusion to draw from the evidence in this case is that the means used by the defendant for the purpose of producing an abortion on the prosecutrix were operating upon her during the interim between the 21st of January and the 20th of February, and when, in the course of events, her monthly period had arrived, and nature began to assert itself on account of the injury which the fœtus had sustained by the drugs and the operation, one or both; that, on said last-mentioned day, the means used produced their natural result, and the fœtus was expelled from the prosecutrix. We believe the jury were

justified by the evidence in arriving at this conclusion, and in rendering the verdict which they did. There being no errors in the record, the judgment is affirmed.

*rmed.*