George S. JACOBS et ux., Petitioners,

v.

Louis M. THEIMER, Respondent.

No. B–4583.

Supreme Court of Texas.

Feb. 19, 1975.

Rehearing Denied March 19, 1975.

Strasburger, Price, Kelton, Martin & Unis, Royal H. Brin, Jr., Bean, Francis, Ford, Francis & Wills, Dallas, for petitioners.

Fillmore, Lambert, Farabee & Purtle, Glynn R. Purtle and Larry L. Lambert, Wichita Falls, for respondent.

REAVLEY, Justice.

Dortha Jean Jacobs contracted rubella in the first trimester of pregnancy and subsequently gave birth to a child whose major organs were defective. Mrs. Jacobs and her husband brought this suit against Dr. Louis M. Theimer, alleging his negligence in failing to diagnose the rubella and to advise them of the attendant risk, and seeking damages for the medical expenses for treatment and care of the child and for their own emotional suffering. The trial court entered summary judgment for the defendant doctor, and the Court of Civil Appeals affirmed. 507 S.W.2d 288. We hold that a cause of action is pleaded and remand for trial.

From the pleadings and depositions we see these contentions of the plaintiffs: Mrs. Jacobs became ill (with what they now know was rubella) in early July of 1968 while on a brief vacation trip. When she returned home she consulted Dr. Theimer and was hospitalized. During that hospitalization Dr. Theimer informed her that she was pregnant. The discovery alarmed her and she asked him if her illness might have been measles, but he assured her that this was not so. Seven months later, in March of 1969, the child

was born. On March 21, 1969, the parties first learned of the extensive toll of the rubella upon the child. Heart surgery was performed in June of 1969, and this was followed by many operations and treatments in Houston, Dallas, Baltimore, and Washington. By the time of the trial in 1973, the medical costs totaled $21,472. The plaintiffs say that they would have had the pregnancy terminated if they had been properly informed by the defendant doctor. Mrs. Jacobs says in her deposition that if it had not been for the assurance by Dr. Theimer: "I would have gone to any length to have found out what the chances of my child were, and after having found this out, I would have done the kindest thing that I could have known to have done for her, and that would have been to terminate the pregnancy."

■ The defendant made no attempt in his motion for summary judgment to negate the allegations of negligence and proximate cause. We must assume the truth of the plaintiffs' contentions at this point. Prestegord v. Glenn, 441 S.W.2d 185 (Tex.1969). The sole basis for the summary judgment in the lower courts was the prohibition against abortion in this state's penal code in 1968. At that time eugenic abortions (to prevent the birth of a defective child) were prohibited in Texas; the only justification for abortion was the preservation of the mother's life.[1] This remained the Texas law until all of the penal code provisions relative to abortion were declared to be in violation of the United States Constitution in Roe v. Wade,

[1]. In 1959 the commissioners of the American Law Institute tentatively proposed that the grounds for justifiable abortion include not only the protection of the health and life of the mother but also the avoidance of birth of a child with grave physical or mental defect and, additionally, those cases where the pregnancy resulted from either rape or incest. Art. 207.11, Model Penal Code, Tentative Draft No. 9, May 8, 1959. In the comment to that tentative draft at page 154 it is said that eugenic abortions were then regularly performed by responsible physicians in hospitals throughout

the country. In an article appearing in the Journal of The American Medical Association in 1966 it is said: "It is an accepted fact that pregnancies are terminated by reputable physicians in licensed hospitals for reasons other than to preserve the life of the mother, e. g., on health, humanitarian, and eugenic grounds, and thus an open violation of the law." 195 JAMA 140, 141 (January 10, 1966). Colorado has permitted eugenic abortions since 1967. Ch. 190 (1967) Sess.Laws of Colo. 284; Colo.Rev.Stat. 40–2–50(4) (1967).

410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

. The acts of negligence by defendant which are alleged by the plaintiffs in their pleading include his failure to diagnose and to inform plaintiffs as to the condition of Mrs. Jacobs due to her having contracted rubella. The complaint is *not* that the defendant doctor failed to perform an abortion or to tell Mrs. Jacobs that she should obtain an abortion elsewhere. We may not penalize the defendant for complying with the penal code of this state as it stood in July of 1968; but the plaintiffs contend only · that the defendant should have given them information as to Mrs. Jacobs' condition and then, with the information she had a right to expect from her doctor, the decision would have been made by the plaintiffs themselves to terminate the pregnancy.

■ The Court of Civil Appeals suggests that by affording the patient proper diagnosis along with additional information as to the risk of harmful effects upon the expected child, the defendant doctor would thereby have become guilty as an accomplice to any abortion subsequently obtained by the plaintiffs. In this the Court erred. There would have been no criminal liability unless the doctor advised the plaintiffs to commit an illegal act and unless the illegal act were committed. Fondren v. State, 74 Tex.Cr.R. 552, 169 S.W. 411 (Tex.Cr. App.1914); Cooper v. State, 69 Tex.Cr.R. 405, 154 S.W. 989 (Tex.Cr.App.1913); Tucker v. State, 461 S.W.2d 630 (Tex.Cr. App.1971). Plaintiffs do not contend that the defendant should have suggested an abortion or even spoken to them about taking that action, and there is no basis in the summary judgment proof to establish that an illegal abortion would have been obtained by Mrs. Jacobs.

■■ Assuming that there would have been no violation of the criminal law as of 1968, and apart from that area of the law, Mrs. Jacobs says that a patient of Dr. Theimer had the right to information adequate for her to exercise an informed consent or refusal to his medical treatment during her pregnancy. Dr. Theimer was under a duty to make reasonable disclosure of that diagnosis, and risk of the proposed treatment in continuing the pregnancy, as would have been made by a reasonable medical practitioner under the circumstances. Wilson v. Scott, 412 S.W.2d 299 (Tex.1967); Anno: "Malpractice: physician's duty to inform patient of nature and hazards of disease or treatment," 79 A.L. R.2d 1028 (1961). For purposes of weighing the summary judgment, we assume that defendant has failed to meet the accepted medical standards in this respect.

We do not regard the issue before us as requiring our decision of the public policy either for or against abortion. This is a matter of very different but very deep feeling. So long as no violation of criminal statutes is proposed, the courts should regard the question as one to be resolved by the wife and her husband. At least, the courts should not penalize them for the choice which these plaintiffs say that they would have made.

The difficulty in the case is seen when we consider the damages for which recompense is sought by plaintiffs, which are the expenses, past and future, required to treat the birth defects of the child as well as their own emotional suffering. It seems to be unquestioned that there was no available treatment of Mrs. Jacobs during her pregnancy that would have avoided any defect with which the child was afflicted when born. The only alternative by which the plaintiffs' damages could have been avoided, if the plaintiffs had been fully informed about rubella and its consequences, was the termination of the pregnancy. Again, we assume that Mrs. Jacobs could and would have terminated the pregnancy by lawful means, since that showing would be essential for a causal connection between defendant's failure to inform and plaintiffs' damages. This brings us to the question: when may damages be recovered

by reason of birth rather than non-birth, by reason of life rather than no life?

Suits seeking recovery of damages due solely to the existence of life, rather than no life, have not met with favor in the courts. *See*, Rieck v. Medical Protective Co., 64 Wis.2d 514, 219 N.W.2d 242 (1974); Stewart v. Long Island College Hospital, 35 A.D.2d 531, 313 N.Y.S.2d 502 (1970), aff'd 30 N.Y.2d 695, 332 N.Y.S.2d 640, 283 N.E.2d 616 (1972); Williams v. State of New York, 18 N.Y.2d 481, 276 N.Y.S.2d 885, 223 N.E.2d 343 (1966); Aronoff v. Snider, 292 So.2d 418 (Fla.App. 1974); Anno: "Tort liability for wrongfully causing one to be born," 22 A.L.R.3rd 1441 (1968). A cause of action has been allowed even when birth was given to a healthy child. Troppi v. Scarf, 31 Mich. App. 240, 187 N.W.2d 511 (1971); Ziemba v. Sternberg, 45 A.D.2d 230, 357 N.Y.S.2d 265 (1974); Jackson v. Anderson, 230 So. 2d 503 (Fla.App.1970); Custodio v. Bauer, 251 Cal.App.2d 303, 59 Cal.Rptr. 463, 27 A.L.R.3rd 884 (1967); *Contra,* Terrell v. Garcia, 496 S.W.2d 124 (Tex.Civ.App.1973, writ ref'd n.r.e.)

The case most nearly resembling the one before us is that of Gleitmann v. Cosgrove, 49 N.J. 22, 227 A.2d 689 (1967), noted at: 46 Tex.L.Rev. 1004 (1968), 10 So.Tex.L.J. 174 (1968), 46 No.Car.L.Rev. 205 (1967). In the New Jersey case the defendant doctor was alleged to have assured the mother that German measles suffered by her during pregnancy would have no effect upon her child, but the child when born was seriously impaired. Mrs. Jacobs, our plaintiff, alleges that the defendant doctor assured her that she had not suffered German measles, whereas she had in fact contracted the disease which had its serious effect upon her child. The New Jersey Supreme Court majority (4–3) held that it could not measure life with defects against no life at all. Insofar as the child sues for damages for life itself or the parents sue for damages for all expenses incurred and to be incurred in raising the child and for their own mental or emotional anguish, the objection is more understandable. The objection is to an award based upon speculation as to the quality of life and as to the pluses and minuses of parental mind and emotion.

The economic burden related solely to the physical defects of the child is a different matter which is free from the above objection. These expenses lie within the methods of proof by which the courts are accustomed to determine awards in personal injury cases. No public policy obstacle should be interposed to that recovery. It is impossible for us to justify a policy which at once deprives the parents of information by which they could elect to terminate the pregnancy likely to produce a child with defective body, a policy which in effect requires that the deficient embryo be carried to full gestation until the deficient child is born, and which policy then denies recovery from the tortfeasor of costs of treating and caring for the defects of the child.

Previous Texas cases have indicated this distinction between the cause of action which seeks damages for wrongful birth or life and the cause of action seeking recovery of those expenditures required because the child is deformed—even though the tort was causally related to birth itself and not to deformation alone. In Terrell v. Garcia, 496 S.W.2d 124 (Tex.Civ.App. 1973, writ ref'd n.r.e.), the defendant doctor was alleged to have negligently performed an unsuccessful sterilization operation upon the mother. She subsequently conceived and gave birth to a healthy child. The suit sought recovery of the financial expenses of the care and maintenance of the normal child. Summary judgment for the defendant was upheld. On the other hand we remanded for trial the plaintiffs' cause in Hays v. Hall, 488 S.W.2d 412 (Tex.1973). There the complaint against the defendant doctor was that he had negligently performed a vasectomy operation upon the father and then misrepresented the effect of the operation. The suit was dismissed on the ground that

limitations had run, and this was the issue discussed in the opinion. However, the case was remanded for trial without any suggestion that no cause of action was stated. This Court pointed out the allegations of plaintiffs that defendant doctor knew that two deformed children had been born to the plaintiffs and that the purpose of the operation was to remove the possibility of the birth of additional deformed children. The damages alleged included medical and hospital expenses of a deformed child which died after living for nine months.

■■■ The plaintiffs George and Dortha Jacobs have stated a cause of action against Dr. Theimer. The suit for recovery of expenses reasonably necessary for the care and treatment of their child's physical impairment, due to Mrs. Jacobs having contracted rubella, is not barred by considerations of public policy. This will be the limit of recovery allowable to plaintiffs. We do not have before us further questions upon the measure of damages such as the period of time for which future expenses are recoverable or the offsetting costs of a legal abortion, and those questions are therefore not discussed.

The judgments of the courts below are reversed; the cause is remanded to the trial court.

Concurring opinion by DANIEL, J.

Dissenting opinion by POPE, J., in which DENTON, J., joins.

DANIEL, Justice (concurring).

I concur in the result. This cause of action does not involve any allegation that Dr. Theimer was negligent in not having advised or performed an abortion. The cause of action is based on Dr. Theimer's alleged negligence in failing to properly diagnose Mrs. Jacobs' prior illness as rubella and therefore failing to advise her of the attendant risks to the unborn child. Such advice would not have violated any Texas law.

POPE, Justice (dissenting).

I respectfully dissent. The summary judgment proof shows that Dr. Theimer was negligent in failing to diagnose Mrs. Jacobs' condition as rubella and in failing to advise her that rubella when contracted during pregnancy often results in a defective child. The summary judgment proofs show that there was no known cure for rubella and the only alternative open to Mrs. Jacobs was to terminate the pregnancy by abortion, as that term was defined by statute at the time of her pregnancy in 1968. Since there was no known cure for rubella, defendant's negligence in failing to diagnose it was not a proximate cause of any damages.

The Jacobses contend that Dr. Theimer should have advised them so they could make the decision to terminate the pregnancy. In 1968, under the summary judgment proofs, there was no lawful way the Jacobses could do that which was the sole solution to the problem. No ordinary physician or other person could foresee an abortion in violation of the statutory and case law as it then existed.

In 1968, Article 1191, Vernon's Ann.Penal Code, defined an abortion as the destruction of the fetus or embryo in the woman's womb or the causing of a premature birth.[1] Punishment for performing or procuring an abortion even with the woman's consent subjected the violator to a

---

1. "If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By 'abortion' is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused."

penalty of two to five years in the penitentiary. Article 1196[2] permitted an abortion for the purpose of saving the life of the mother. The record before us shows that the mother's health or life was not endangered. Article 4505,[3] Vernon's Ann.Civ.St., stated that the State Board of Medical Examiners may refuse to admit persons to its examinations and to issue a license to one who procures or aids or abets "the procuring of a criminal abortion." Article 4506[4] provided that the Board of Medical Examiners may cancel, revoke, or suspend the license of a practitioner for any cause for which the Board is authorized to refuse to admit one to its medical examinations as provided in Article 4505, *supra*. Article 1192 of the Penal Code said that anyone who furnishes the means for procuring an abortion is an accomplice.

In 1968, the legal advice which was available to Dr. Theimer would show that there were physicians who had actually served terms as felons in the Texas penitentiary for violations of the abortion laws, that Article 1191 had been ruled constitutional in Jackson v. State, 55 Tex.Cr. 79, 89, 115 S.W. 262 (1908), and that one is an accomplice who furnishes the means, medicine or instruments to produce an abortion. Moore v. State, 37 Tex.Cr. 552, 40 S.W. 287 (1897). This then was the Texas policy, the expressed standard of the Board of Medical Examiners, as well as the statutory and judicial standard for physicians and all others with respect to abortions as then defined.

But, it is urged, the choice was not Dr. Theimer's; it was Mrs. Jacobs'. Mrs. Jacobs had no lawful choice as viewed from the 1968 vantage point but to obey the law which prohibited her from destroying or procuring the destruction of the embryo. The suggested alternative would have made a felon of any person whom she procured to produce an abortion as then defined.

But Mrs. Jacobs says she could have gone to some jurisdiction which permitted abortions. The presumption is that foreign law is the same as that of Texas in the absence of pleading and proof of such law. 1 C. McCormick & R. Ray, Texas Law of Evidence § 99 (2d ed. 1956); Ex parte Gesek, 164 Tex.Cr.R. 652, 302 S.W.2d 417 (1956). There is no proof in this record of any foreign law.

Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, which was decided in January, 1973, ruled that all of the Texas laws concerning abortions as well as those of the other states were unconstitutional *ab initio*. According to the argument, those laws, proscriptions and penalties, never existed, did not exist even in 1968.

The undisputed proof is that during 1968 the processes of the law and "the power to pass decisive judgment" for abortion law violators were in full operation in Texas and continued as such until January 22, 1973. The state of the laws and the machinery to try, enforce and execute those laws are a part of the facts by which we must judge one's foreseeability that they would be swept aside to permit an abortion as early as 1968. I do not think it is good law which holds that an ordinary prudent person or an ordinary prudent physician could reasonably foresee that an abortion law which had stood since 1854 would be violated. Tex.Laws 1854, ch. 49, § 1, at 1502; 3 H. Gammel, Laws of Texas 1502 (1898). Nor do I think that any ordinary

2. "Nothing in this chapter applies to an abortion procured or attempted by medical advice for the purpose of saving the life of the mother."

3. "(2) Conviction of a crime of the grade of a felony, or one which involves moral turpitude, or procuring or aiding or abetting the procuring of a criminal abortion."

4. "The Texas State Board of Medical Examiners shall have the right to cancel, revoke, or suspend the license of any practitioner of medicine upon proof of the violation of the law in any respect with regard thereto, or for any cause for which the Board shall be authorized to refuse to admit persons to its examination, as provided in Article 4505 of the Revised Civil Statutes of Texas, 1925, as amended."

prudent person in 1968 would foresee that he could break the law and successfully prove that the statutes were unconstitutional, when the Texas Court of Criminal Appeals had ruled to the contrary. An ordinary prudent person, knowing that people were in the penitentiary for violations of the abortion statutes, would not himself break the law, violate nor find an ordinary prudent physician who would violate medical standards; incur the expenses incident to resisting an indictment, prosecution and trial for abortion; perfect an appeal to the Texas Court of Criminal Appeals and expect a judgment which reversed its own long-standing decision upholding the validity of the abortion statutes; take the risks of imprisonment as a felon as well as the loss of his medical license and his career; and submit himself to such embarrassments because it was reasonably foreseeable that four years later the abortion statutes would be nullified by the United States Supreme Court.

The law as viewed by people in 1968 was not an abstraction; it was statutes, precedents, sheriffs, judges, grand jurors, process, arrests, courts, wardens. These were the vital characteristics of the law as viewed by one about to violate the abortion statutes. It is not necessary that we enter upon the debate between positivism and the natural law, but we ought not to impose a questionable philosophical view upon the ordinary prudent man and require him to violate laws which none of us knew would be invalidated years later. The teaching of the majority opinion is that everyone should pass his own judgment upon the "law in the books" and the "law in action" and decide which laws he should obey. Today's decision creates two hundred million ordinary prudent constitutional lawyers, all endowed with the gift of prophecy.

I would affirm the judgment of the courts below.

DENTON, J., joins in this dissent.