## W. B. JACKSON v. THE STATE.

### No. 4049. Decided December 14, 1908.

#### 1.—Murder—Attorney and Client—Witness under Rule.

Where upon trial for murder it appeared that a certain attorney was leading counsel in defendant's case, it was reversible error to place him under the rule during the entire trial as a witness; and this although the defendant had other able counsel to defend him in the case. The Bill of Rights guarantees that when the accused is placed upon his trial he shall have the right to be heard by his counsel and himself, and he can not be deprived of the advantage of his selected counsel by placing him under the rule as a witness.

#### 2.—Same—Evidence—Dying Declarations—Charge of Court—Predicate.

Upon trial for murder where the predicate laid for the introduction of a dying declaration did not show that the same was voluntarily made and there was an issue in regard to the proper predicate for the admission in evidence of said dying declarations, the same should have been submitted to the jury as a question of fact, with instructions that the same should be disregarded in the absence of a proper predicate.

#### 3.—Same—Evidence—Parts of Acts and Declarations.

Where upon trial for murder the State was permitted to show that the defendant was at the home of the deceased on the morning of the day of the alleged abortion, and this testimony was relied upon by the State as criminative, it was error under the terms of article 791 Code Criminal Procedure to refuse testimony on the part of the defendant to show his innocent intention in making the visit to the house of the deceased. Following Davis v. State, 3 Texas Crim. App., 91; Pratt v. State, 53 Texas Crim. Rep., 281, and other cases.

#### 4.—Same—Abortion—Murder—Charge of Court.

Where upon trial for murder superinduced by an abortion by willfully inserting into the womb of deceased an instrument to the grand jurors unknown, the evidence showed that the deceased died of blood poisoning which may have been caused by an abortion by different means used, and that the defendant denied that he had performed any operation whatever upon the deceased, it was reversible error in the court's charge to submit to the jury several of the means by which the abortion could have been produced and omit to charge upon one of the means which would have exculpated the defendant.

#### 5.—Same—Charge of Court—Murder in First Degree.

Where upon trial for murder the defendant was convicted of murder in the second degree, this eliminated murder in the first degree, which thereby passed out of the case and the charge thereon need not be considered on appeal.

#### 6.—Same—Charge of Court—Alibi.

Where upon trial for murder there was no testimony with reference to an alibi the court should not have submitted this issue, as under the facts it was injurious to the rights of the defendant.

#### 7.—Same—Charge of Court—Words and Phrases.

Upon trial for murder superinduced by an abortion, which the defendant denied but was nevertheless convicted of murder in the second degree, it was error in the court's charge to attempt to define words and phrases under which defendant could be justified or excused or his punishment mitigated; the court not submitting the law under which an abortion was justifiable, and the evidence not raising any issue which justified the charge of the court.

**8.—Same—Constitutional Law—Offense of Abortion.**

The offense of abortion as defined by statute is not unconstitutional and void, upon the ground that the statute does not sufficiently define such offense.

Appeal from the District Court of Johnson. Tried below before the Hon. O. L. Lockett.

Appeal from a conviction of murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*Odell & Johnson* and *Poindexter & Padelford,* for appellant.—On question of placing defendant's counsel as a witness under the rule: Boatmeyer v. State, 31 Texas Crim. Rep., 473; Johnican v. State, 48 S. W. Rep., 181. On question of admitting dying declaration: Krebs v. State, 3 Texas Crim. App., 348; Kirby v. State, 25 Texas Crim. App., 203; 1 Elliott on Evidence, secs. 348-9. Upon question of rejecting defendant's explanation of his presence at the house of the deceased: 1 Greenleaf, sec. 108; 1 Elliott on Evidence, sec. 530-2; Gillian v. State, 3 Texas Crim. App., 132; Williams v. State, 4 Texas Crim. App., 5; Cook v. State, 22 Texas Crim. App., 511; Farrar v. State, 29 Texas Crim. App., 250; Koller v. State, 36 Crim. Rep., 496; Butler v. State, 33 Texas Crim. Rep., 232; Trotter v. State, 37 Texas Crim. Rep., 468; Merrit v. State, 39 Texas Crim. Rep., 70; Evans v. State, 76 S. W. Rep., 467.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—The indictment contains several counts, the first only, being under consideration. This charged that appellant "did then and there with malice aforethought kill May Carden, a pregnant woman, by then and there unlawfully, wilfully and designedly inserting and thrusting an instrument, the name and description of which is to the grand jurors unknown, into the womb and body of the said May Carden, with the intent on the part of him, the said W. B. Jackson, thereby to cause and procure the abortion and miscarriage of the said May Carden of the child wherewith she was then and there so pregnant against the peace and dignity of the State." The record is very voluminous, having nearly 500 pages of statement of facts. Many questions are presented for revision. As the case will be reversed on other questions, we will not discuss the alleged error of the court in overruling the application for continuance. Nor the matters presented by exception to some of the rulings of the court in regard to a colloquy between the court and counsel, in which the court imposed a fine on one of the attorneys defending. These matters will hardly occur upon another trial, and the presence of the absent witness may be secured.

1. It is shown by a bill of exceptions that W. H. Skelton was employed by appellant to represent him on the trial. That he

was a practicing attorney of many years standing in Johnson County and was the first lawyer employed by appellant to represent him; that Skelton resided at Alvarado where appellant also resided, and had consulted with appellant more frequently in regard to his case than the other attorneys and had a more complete and perfect knowledge of the evidence of the case than any other attorney; that in fact Skelton was appellant's leading counsel. The court was requested not to place Skelton under the rule as a witness. He was placed under the rule, sent out and kept out of the courthouse and under the rule during the entire trial, and was instructed as all the witnesses were not to talk to any one except the attorneys in the case about the evidence, nor as to what his evidence would be and after they had testified as to what their evidence had been. The rule was invoked. The court signs this bill with the explanation that when the witness was sworn the county attorney objected to his remaining in the courtroom and as the defendant had invoked the rule and as the county attorney stated he might be a material fact witness he put him under the rule. His testimony in this case which was referred to and made a part of this bill, shows that he accepted employment, and if an attorney accepts employment under such circumstances then he should be excluded from the courtroom while the testimony is being given. In this case the defendant had the assistance and counsel, during his trial, of the following attorneys: Poindexter and Padelford, Odell and Johnson, and John Baker. With such able counsel no injury could have resulted to the defendant in the courts excluding only one. This is practically and almost literally the explanation of the trial judge. Our Bill of Rights guarantees that when the accused is placed upon his trial, he shall have the right to be heard by his counsel and himself, either or both. The defense of an accused by counsel is a very valuable right and one which is guaranteed him by our Constitution and laws, and whenever the relation of client and attorney exists, the accused has the guaranteed right of having counsel represent him at any, all and every stage of his case while before the courts. "Usually the legal discretion of a court exercised during a trial in reference to the enforcement or relaxation of the 'rule' will not be revised by the appellate court, but this is not always the case. The prime, as well as the ultimate, object of this statute is to secure a fair hearing of the testimony, and when necessary to attain these objects and purposes, the rule should be relaxed. From the very nature of the matter there can be no fixed rule in such state of case other than a due administration of the law. It is a practice alike familiar to the courts and the profession that this rule is relaxed in regard to attorneys of the court. Brown v. The State, 3 Texas Crim. App., 294; Johnson v. The State, 10 Texas Crim. App., 571; Reach v. The State, 41 Texas, 262; Sherwood v. The State, 42 Texas, 498. And we do

not think it could be enforced as to attorneys engaged in the particular case on trial, for if such were the rule the State could thus be deprived of a prosecuting attorney, and the defendant of his counsel, and the rule be made paramount to the code, defeat the very objects of its existence, and even infringe the Bill of Rights, wherein it is provided that the accused shall have the right to be heard by counsel, as well as by himself." This quotation is from Boatmeyer v. State, 31 Texas Crim. Rep., 473. See also Johnican v. State, 48 S. W. Rep., 181; White's Annotated Code Criminal Procedure, sec. 767, Subdivision 2, for collation of authorities. The fact that appellant may have been ably defended by other counsel does not abridge his right to have counsel of his own selection and as many as he may see proper to employ to defend him. Nor can he be deprived of the advantage of his selected counsel by placing them under the rule as witnesses. If this rule should obtain, then the State could place counsel of accused under the rule as witnesses in behalf of the State and deprive him of such counsel as he might see proper to select or employ.

2. The dying declarations of May Carden were introduced over appellant's objection. Quite a number of reasons are urged why this ruling was error. Without going into a detailed statement, a fair summary in regard to this matter can be thus stated: Dr. Turner and Dr. Self were called in as physicians and attended the deceased. When Dr. Turner was first called he administered an opiate and requested that Dr. Self be called, which was done. They met at the bedside of the deceased; they found her suffering excruciating pain and giving vent to vociferous exclamations indicating the intensity of her pain. Among other things she stated she was going to die, that she could not stand it. She was suffering from hemorrhages from the womb which was greatly distended, the discharged matter being quite offensive. The theory of the State was that her troubles were brought about by an abortion. Dr. Turner testified that they made a digital examination, passed their hands into the "vagina and uterus and found that the uterus was full—the mouth of the uterus was dilated—open, and she had passed several pieces of membrane and blood clots and the uterus was full of retained embryonic tissue, and an awful bad odor." This embryonic tissue was evidently the foetus of a child. The opinion of this physician is pretty clear that she was not in a dying condition, but his testimony showed that she was suffering intense pain from the discharge; that the exclamation of her belief that she was dying was more the result of the pain than a real belief of death, and that he had often heard this from women who were in child birth or under similar conditions. Dr. Self, in talking with the deceased, asked her what brought about her condition. She replied: "I am two months gone and I had an abortion done." She says, "I have got to have relief." She was suffering and taking on greatly. "I says, 'well, we have got to know

all about this thing and you must just tell us all about it before I will take charge of the case; these are cases that a doctor dislikes to get into anyway, and we must know all about it.' They tried to keep from telling us, and we told her we would just have to know it, as to who did the operation and where it was done, and she says, 'It was done at Alvarado.' I says, 'Who did it? You had as well tell it all because we have got to know it,' and Scott, the young man in the room with her began to beg us not to require them to tell who it was, and I says, 'I must insist on knowing who it was before I take charge of the case,' and he says, 'Well, tell him who it was,' and she says, 'Dr. Jackson, of course.'" Q. (by State's counsel) "Said what, Doctor? Says, 'tell him,' says to Scott, says "why, tell him who it was, it was Dr. Jackson, of course.' I asked her how it was done and she said he used instruments and tried to take it away. * * * Well, she made the statement several times that she could not stand it; that it was going to kill her. She could not stand the pain? Yes, sir, I think she made the statement—I am quite sure she did, that she was going to die; that she could not stand the pain; that the pain was killing her and that she wanted to be relieved." This witness says that she was crying out on account of the excruciating pain she was suffering when he and Dr. Turner were questioning her, and that she wanted him to do something for her; that she was wanting relief all the time.

"Q. And you declined to do anything for her and told her you must have this information as to what brought about this condition before you would take the case and do anything for her, didn't you? A. Yes, sir. Q. Now, when Scott spoke up, what did he say? A. Scott says, 'Gentlemen, I don't want to tell who it was, I would rather not say that.' Q. And you would not have anything to do with it until you found out? A. We left that impression on her, I am quite sure. Q. You would not do anything for her until she gave you the facts? A. Yes, sir." This witness said he did not think she was dying at the time, and he further said that her cries were caused by the pain she was suffering rather than from any calm, deliberate belief that death was impending. This further question was asked Dr. Self: Q. Would you undertake to say that she was conscious of approaching death at the time you were there? A. Well, no, I really don't think she was." He stated that she also said in this conversation that as soon as she got well enough she intended to marry Scott. Without going into any details in regard to Scott's connection with the matter the evidence shows that he was her seducer and lover and author of her shame.

Now the question is urged by appellant that this dying statement of the girl was not admissible; that it was made under duress and was not voluntary. The statute requires that a dying declaration, to be admissible, must be freely and voluntarily made, and if this predicate does not show that it was voluntarily made, then the state-

ments of the girl should have been rejected. Under the above state-
ment, it is without contradiction that the girl was suffering acutely,
giving loud and vociferous exclamations of pain and expressing the
opinion that she was going to die. Under this condition of things
with her mind influenced in this way and by her pain, the physi-
cians informed her that they would not do anything for her unless
she told them about how her trouble came about, and who performed
the operation. So we have the girl laboring under the firm impression
that she was going to die, and the physicians refusing to give her any
relief unless she told them the secret of her ailment. It would hardly
be a correct conclusion not to say that this testimony raised a serious
question as to whether, under these circumstances, she voluntarily
made the statements, and in fact there is evidence from these doctors
that she would not tell, and a protest from Scott, who was sitting
by, and apparently, if not in fact, controlling her, that they did
not want to tell it. However, finally, in order to obtain relief from
her suffering and apprehension and as an inducement to the doctors
to treat and relieve her of pain, she turned to Scott, who told her to
*tell them what she told him.* She then replied, "It was Dr. Jackson,
of course." Under the facts stated and in her then *condition, it*
certainly was a most powerful incentive and weight upon her mind
as an inducement, if not a coercion, to make the statement she did
make, especially in view of the fact that up to that time she and her
lover both had insisted on not making the statement. But certainly,
in view of all the evidence the testimony raised the issue that the
dying declaration was not voluntary, but by over-persuasion, or duress,
for that the evidence of the two physicians show they had declined to
treat or relieve her of what she thought was her dying condition, unless
she gave the name of the party who had operated upon her. This
sufficiently presents the question so as to require the court to submit
the issue to the jury as to the condition of her mind at the time,
and if they should find that she was under duress, or over-persuasion,
or not under a sense of impending death, then they should disregard
her statement, in arriving at a verdict. The authorities are numerous
to the effect that where there is an issue in regard to the proper
predicate for the admission of dying declarations, or confessions,
the court should submit that as an issue of fact to be determined
by the jury, and if found favorable to the appellant to disregard
such declarations or confessions. Brown v. State, not yet reported.

3. The State introduced evidence showing that appellant went
from his home in Alvarado to the city of Cleburne on the morning
of the day of the alleged operation upon deceased. That while in
Cleburne he visited the home of deceased, who resided with her father;
had some conversation with Mrs. Grimmett, sister of deceased, and
was informed that deceased had gone on the early morning train to
Alvarado and was supposedly at appellant's house. At this he ex-
pressed surprise and perhaps denied her visit. His visit to Cleburne

and other incidents and circumstances connected with it were relied upon by the State as criminative. In other words, it was the theory of the State that appellant's trip to Cleburne was made in connection with deceased, of seeing and visiting her at her home in Cleburne, and that all these matters bore upon his purpose of seeing the deceased and producing an abortion. This is but a concrete conclusion of the facts without going into a detailed statement of the evidence. His trip to Cleburne and purpose sought to be drawn from it were matters of some cogency as viewed by the prosecution. Appellant sought to disprove or to get away from the effect of this testimony by showing the object of his visit to Cleburne was for an entirely different purpose, and that his reason for going was innocent. He testified in person that he went to Cleburne on that day, it being the first Monday of the month, for the purpose of selling his horse. That the horse had corns on his feet and for that reason was not a fit animal to be used and driven in his practice, he being a physician. He offered to prove by himself, in this connection, that he had a week or more prior to this first Monday, had an engagement or contract with one Foster to meet him in Cleburne and take charge of and sell his horse; that Foster was under the impression that he might sell the horse to Frazier. Appellant was permitted to testify that he went to Cleburne for the purpose of selling his horse, but all of the testimony offered through himself relating to his previous arrangement with Foster to effect a sale of the horse on that day, was excluded. Exception was reserved to this ruling. Foster was also introduced by appellant, through whom it was expected to prove that he had made the contract or agreement with appellant a week or more previous to the first Monday to meet him in Cleburne and effect a sale of the horse, but was taken sick the evening before and was unable to carry out the contract or agreement. This evidence was also excluded. He also proposed to prove by his wife that on account of the condition of the feet of the horse that he was unfit for service in her husband's practice of his profession, and that they had for some time prior to this particular occasion discussed the propriety of selling the horse, and that her husband had frequently talked about it, and that this particular date had been set as a time for effecting the sale. This testimony was also excluded over appellant's objection.

We are of opinion that under the authorities these rulings of the court constituted error. There is some testimony in regard to statements of appellant en route to Cleburne excluded by the court, in which perhaps there was no error. Under the terms of article 791 of the Code of Criminal Procedure, and the authorities in this State construing that statute, we think the testimony of appellant, his wife and Foster should have been admitted. By the terms of the statute cited, wherever the acts, declarations, conversations, writings, etc., are put in evidence by one side, acts, declarations, writings, etc., which explain the testimony already introduced, may be met by

the other side, and any harmful or hurtful tendency may be thus met. Davis v. State, 3 Texas Crim. App., 91; Epson v. State, 29 Texas Crim. App., 607; Everett v. State, 30 Texas Crim. App., 682; Schauer v. State, 60 S. W. Rep., 249; Nelson v. State, 58 S. W. Rep., 107; Poole v. State, 45 Texas Crim. Rep., 348; Pratt v. State, 53 Texas Crim. Rep., 281; Dallas Term, 1908. Upon another trial the testimony of the above named parties should be admitted.

4. There are many questions suggested for reversal in regard to the charges given and refused. Appellant was indicted under article 641, Penal Code, which provides: "If any person shall designedly administer to a pregnant woman, with her consent, any drug or medicine, or shall use toward her any violence or any means whatever, externally or internally applied, and shall thereby procure an abortion, he shall be punished by confinement in the penitentiary not less than two nor more than five years; if it be done without her consent the punishment shall be doubled." Article 643 is as follows: "If the means used shall fail to produce an abortion the offender is nevertheless guilty of an attempt to produce abortion; provided, it be shown that such means were calculated to produce that result, and shall be punished by fine of not less than one hundred nor more than one thousand dollars." Article 644 provides: "If the death of the mother is occasioned by an abortion so produced, or by an attempt to effect the same, it is murder. Article 646 thus reads: "Nothing contained in this chapter shall be deemed to apply to the case of an abortion procured or attempted to be procured by medical advice for the purpose of saving the life of the mother." So it will be seen by the terms of the articles quoted that it is a felony to produce an abortion upon a pregnant woman, with or without her consent, and if done without her consent the punishment shall be double that where it is done with her consent. By the terms of article 643 it will be observed that if the means shall fail to produce the abortion, the appellant would be guilty only of a misdemeanor, and it must be shown that the means by which he attempted to produce the abortion were calculated to produce that result; and if the abortion occurs under the terms of article 644 there would be a case of murder, but if it was done, either as abortion or an attempt at abortion, with medical advice for the purpose of saving the life of the mother, there is no offense. The evidence in the case for the State is that appellant was the intimate friend of the family, and had done much of their practice as a physician; that the deceased went to appellant's home in Alvarado to see him with reference to her then condition, and that when in Alvarado, by the use of some instruments unknown and about which there is no testimony as to character or kind, appellant operated upon her for the purpose of producing an abortion, and that this occurred on Monday evening not earlier than 5:20 o'clock; that the next day somewhere about 4 or 5 o'clock in the evening, she was taken with violent pains of the most excruciating character, and

that an examination of the case by the physicians called to administer to her, showed a case of blood poisoning located in and about the womb. It is necessary, we think, here to enter into a description of the appearance of the womb and its condition as detailed by the physicians. The appellant's theory and to which he testified and introduced evidence to sustain, was that he did not perform upon the deceased at all; that on his return to Alvarado in the evening, which was about 5:20 o'clock, he found the deceased,—met her on the street. It is shown by other evidence that he went from that point to his residence; that the deceased also went to the residence of appellant, and was at his residence, taking supper and remaining with the family until about 6 or 6:30 p. m., at which last hour she boarded the train and returned to Cleburne, some twelve or thirteen miles distant; that she was seen on the train in a pleasant condition of mind, moving about, giving no evidence of · weakness or of having gone through any operation, or that she had been subjected to any treatment which would be necessary to perform an operation to produce abortion; that on reaching Cleburne she was seen going home and gave no evidence of having been operated upon, or subjected to any anaesthetic. It is further in evidence, and relied upon by appellant, that some two weeks or such a matter before the deceased was taken so violently ill and while on the sidewalk in Cleburne a dog ran violently against her and knocked her feet from under her, and gave her a severe fall on the sidewalk, and that this may have been the moving cause of the abortion, and that under this state of case, if the abortion was produced, it might be two weeks longer before blood poisoning would result. It is further in evidence that the deceased admitted having used a hat pin by inserting it in her womb for the purpose of bringing about the abortion, which, under the facts, if it occurred at all, occurred sometime prior to her visit to Alvarado. It is further in evidence that on Tuesday about 1 p. m. o'clock or such a matter, after the alleged operation of appellant on Monday evening, the deceased assisted her sister in fixing a stovepipe which had in some manner become detached from its proper place; that while doing this she was standing on the top of a chair; that in some manner she fell from the chair, which gave her a considerable jolt and hurt, and that in the course of an hour or such a matter, these violent pains began above described, in which condition she was found when the attending physicians were called. As we gather from the record the first physician reached the residence and the room of deceased about 5 o'clock; that he found her suffering greatly, her pains were excruciating and she gave expression of her agony by loud screams which could be heard as far as the front gate at her home. Under this state of case the court charged the jury in regard to murder in the first and second degree. Also that if appellant did not perform the operation they should acquit or if the fall occasioned by the dog running against deceased, or fall from the chair produced the abortion

and the blood poisoning, they should acquit, but failed to charge the jury if the abortion and blood poisoning was the result of the punctures with the hat pin they should acquit. Error is assigned on this omission of the court. This omission was clearly error. The court selected two phases of the evidence for excusing appellant or authorizing his acquittal, ignoring the third out of his charge. This would have a tendency to cause the jury not to believe and give no credence to the hat pin theory of abortion and having selected the other two theories, that is, the two falls, as a reason for acquittal, the court emphasized the error in not charging upon the hat pin theory. It is the duty of the court to submit every issue that is favorable to the accused and upon which the jury could predicate either an amelioration of punishment, or an acquittal. If appellant was entitled to an acquittal on the theory of either fall, then certainly he was entitled to an acquittal if abortion and blood poison were produced by the hat pin, for in neither event would appellant be responsible for the abortion, nor the blood poison which resulted fatally.

5. It is insisted the court erred in charging on murder in the first degree. We deem it unnecessary to discuss the question as the jury acquitted of that degree and it is eliminated, and upon another trial can not become an issue, whether it affected the case injuriously on the trial or not. So we pretermit a discussion of that phase of the case.

6. The court among other things charged the jury with reference to alibi. Error is assigned upon this phase of the court's instruction. We have read this record with some degree of care and interest, and it is a remarkable case in many respects. If there is evidence in it showing an alibi, we have failed to discover it. The State's case was that appellant was in Cleburne on Monday morning and visited the residence of the father of deceased, where the deceased lived; that he called upon the family, among other things, in obedience to a phone message from Mrs. Grimmett, a sister of the deceased, in which she notified him that her mother had given birth to a child. He went to the residence; while there he was invited to remain for dinner but declined, stating that he had to be back in Alvarado at 2 o'clock; that he had some business there at that time. The evidence is, further, that the deceased was at that time in Alvarado, to which appellant returned about 5:20 p. m. where he met the deceased on the street. The theory of the State is, further, that he took her into his office and there performed the operation. The evidence for the appellant, after meeting her, is that he went directly to his residence and that she also did and took supper with the family. This could not suggest the theory of alibi. The State's theory in connection with the dying declaration of the deceased, was that they were together and that appellant performed the operation. The evidence of appellant shows them together but denies the operation. This charge,

therefore, is not authorized by any evidence from either side, nor from any evidence that was admitted during the trial. It suggested a matter of exoneration to the jury which did not occur and one upon which appellant does not suggest nor rely, doubtless, leaving upon their minds the effect that if the alibi was not true, that the operation was performed by him.

7. The court gave the following charge: "By the phrase and words 'nor tend to mitigate, excuse or justify' as used in this charge, are defined as follows: The word mitigate means to reduce the penalty or punishment; excuse means the reason for the doing of a thing. It does not include justification, but includes and implies that though the act complained of was improperly done, the fact by way of mitigation relieves the doer from legal liability, and by justify, is meant where a homicide is committed in self-defense." If appellant was guilty of a criminal abortion there was no excuse for this nor was there any justification, and certainly from no standpoint could there arise the question of "self-defense." Appellant was in no danger from deceased; she had made no attack upon him; she was simply seeking assistance in relieving herself from her then pregnant condition at his hands, if the State's case is to be credited. The only charge given with reference to the "excuse" is as quoted. What "reason" he had for performing the operation, that would excuse him, is not stated. The statute seems to be very plain upon this proposition, which is that if it was done to save the life of the mother he would be excused. But this statute was not given in charge to the jury. Nor is any fact or condition stated of "mitigation" which would "relieve the doer from legal liability."

8. There are other criticisms of the charge upon which appellant relied for reversal, but under the general proposition stated above, we deem it unnecessary to take them up seriatim and in detail. We think we have sufficiently discussed the matters to the end that the trial court may understand the general view entertained by the court with reference to the submission of the case to the jury and its further trial in regard to other issues. The case is a very complicated one and presents seventy-five assignments of error. The brief is very lengthy and very able, and presents the case from almost every imaginable standpoint arising under the facts.

9. It is also insisted in the motion in arrest of judgment that the statute is unconstitutional and void in that it does not sufficiently define or describe the offense of abortion. We do not concur in respect to this question.

For the errors discussed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*