## SAN ANTONIO PUBLIC SERVICE CO. v. ALEXANDER. (No. 7293.)*

(Court of Civil Appeals of Texas. San Antonio. Feb. 11, 1925. Rehearing Denied March 11, 1925.)

**I. Evidence ⬅118—Declarations admissible as part of res gestæ.**

Declarations are admissible as part of res gestæ when they accompany transaction, and are made under circumstances raising reasonable presumption that they are spontaneous utterance of thoughts created by or springing out of transaction, and so soon thereafter as to exclude presumption that they are result of premeditation or design.

**2. Appeal and error ⬅1059—Any error in refusing to admit evidence that jitney driver was silent when accused of negligence held harmless.**

· Any error in refusing to admit evidence that jitney bus driver remained silent when accused of negligence by passenger immediately after collision with street car was harmless, in view of other facts showing driver's negligence, and of instruction that jitney driver was negligent.

**3. Evidence ⬅472(4) — Testimony collision was unavoidable held conclusion.**

Testimony, by passenger in jitney bus, that street car was so close that collision was unavoidable, held properly excluded as conclusion of witness.

**4. Evidence ⬅556—Expert's knowledge properly tested by questions based on recognized medical authorities.**

In testing knowledge of expert medical witness, it was proper to ask if he agreed or disagreed with statements made by recognized medical authorities on subject.

**5. Appeal and error ⬅1050(1)—Any error in asking expert whether he agreed with statements by recognized medical authorities held harmless.**

Any error in asking expert on nervous diseases whether he agreed with statements by recognized authorities on such diseases was harmless, where testimony of similar character had previously been admitted without objection.

**6. Trial ⬅350(6)—Requiring jury to answer questions whether speed of street car was excessive, etc., held not error.**

In action for injuries to jitney bus passenger from collision with street car, held that it was not error to require jury to answer questions whether street car was traveling at excessive speed, constituting negligence causing or contributing to accident.

**7. Trial ⬅315—Verdict held not quotient verdict because jurors struck average, without agreeing thereon.**

Where jurors, in personal injury action, struck an average of amounts favored by each, but did not agree on the average so reached, and after several further ballots a difference of $2,500 was resolved by "splitting the difference," the verdict was not a quotient verdict.

**8. Damages ⬅132(3)—$21,250, for permanent injuries completely destroying earning power of skilled mechanic, held not excessive.**

Verdict of $21,250, for permanent paralysis depriving plaintiff of use of legs and bladder and completely destroying his earning power as skilled mechanic, held not excessive, where he had life expectancy of 30.35 years, and his monthly earnings averaged over $300.

Appeal from District Court, Bexar County; S. G. Tayloe, Judge.

Action by James A. Alexander against the San Antonio Public Service Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Templeton, Brooks, Napier & Brown and Harper Macfarlane, all of San Antonio, for appellant.

S. Engelking, of San Antonio, for appellee.

COBBS, J. Suit was brought by appellee to recover damages for personal injuries sustained while riding as a passenger in a jitney bus when there was a collision between the jitney bus and a street car. He sued the San Antonio Public Service Company, which operated the street car, J. F. Lozano, who owned the jitney bus, and the Southern Casualty Company, which carried a $2,500 insurance bond on the jitney bus. This appeal is only taken by the San Antonio Public Service Company.

The facts concerning the collision are:

"On July 25, 1922, at about half past 11 o'clock at night, the jitney bus was going south on South Laredo street, traveling from Main Plaza in San Antonio, Tex., to Kelly Field. It was driven by a Mexican named Munez, who was hired by the owner to drive it, and who was about 21 years old, and was occupied by seven or eight passengers, most of them soldiers. As the jitney approached the intersection of South Laredo and Frio streets, the engine got hot, and the driver turned to the right into a gasoline filling station to get some water in the radiator. He went part of the way up into the filling station driveway, and, although the evidence is not exact on this point, it is true that the front part of the jitney was past the corner of the filling station building and the back part of the jitney remained out on the sidewalk, between the curb and the building. The stars were out, but there was no moon.

"The street car was going along Laredo street in the same direction that the jitney was going, and the street car was some distance behind the jitney. There were no passengers in the street car. It was a one-man car, occupied only by the motorman.

"After he had turned up into the filling station, the driver of the jitney saw that the filling station was closed and he backed out into Laredo street at an angle, with the back of the jitney toward town and toward the on-coming street car, and with the front of it toward his destination, which was Kelly Field. The front part of the street car and the back part of the

jitney came together, the jitney was knocked forward against a telephone post, and the plaintiff, who was a passenger in the jitney, claimed that he was seriously and permanently injured in the accident."

The plaintiff in his pleading and proof claimed that the jitney driver was negligent in backing out in front of the street car without looking, etc. The trial judge found that the jitney driver was negligent, and instructed the jury as follows in the court's main charge:

"The court has determined as a matter of law, on a demurrer to the evidence, that the driver of the jitney automobile was negligent in driving the same on to or near the street car track at a moment when said street car was approaching the place where said jitney was stopped."

The plaintiff in his pleading claimed that the motorman of the street car was also negligent in various respects, and three issues as to whether the motorman was negligent were submitted to the jury: (a) Excessive speed; (b) failure to keep a lookout; and (c) discovered peril. The court also asked the jury whether the negligence, if any, of the motorman or the negligence of the jitney driver was the active and primary cause of the collision. The jury answered that the motorman was running the car at an excessive rate of speed, and that this was negligence that directly caused or directly contributed to the accident. They also answered that the motorman did keep a proper lookout, and that he did not discover that the jitney was in a position of peril in time to avoid the collision. The jury also answered that the negligence of the jitney driver was the active and primary cause of the collision. The jury also found that the plaintiff was damaged in the sum of $21,250.

The defendant San Antonio Public Service Company, appellant herein, interposed the general issue, specially denied that its motorman was in any way negligent, and alleged that the accident in question happened on a dark night at about 11:30 p. m.; that the street car was going south on South Laredo street, at a usual, customary, and safe rate of speed, and before it reached the intersection of South Laredo and South Frio streets, and while it was between cross streets, the jitney bus backed out into the street in front of the street car and so close to the street car that the motorman could not stop the car; that the motorman was at his post of duty, and was keeping a lookout ahead, when the jitney came out, and when he saw it come out, the car and jitney were close together, and although the motorman, just as soon as he saw the jitney backing out, put on the brakes as quick as he could, he could not avoid the collision, because the jitney backed out in front of the street car so close to it. This defendant also pleaded certain ordinances of the city of San Antonio and that same were applicable to this case.

Upon the findings of the jury, the court rendered judgment for the plaintiff for $21,250 against the defendants San Antonio Public Service Company and J. F. Lozano (the owner of the jitney), jointly and severally, and judgment that, of said moneys adjudged against said defendant Lozano, the plaintiff have judgment against the defendant Southern Casualty Company, as surety, for $2,500.

[1, 2] The first proposition presented by appellant is:

"This proposition is based on assignment No. 13, and presents the contention that the court erred in excluding the testimony of Harwick, who was one of the passengers in the jitney, that right at the scene of the accident and within five minutes of the accident he stated to the jitney driver, and to the others, that it was the jitney driver's fault, and as the jitney driver remained silent, although such a statement, if untrue, naturally called for a refutation, such evidence was proper as an admission by silence, of the jitney owner's agent, made in the scope of his employment, and was part of the res gestæ."

This proposition fairly states the facts and the testimony ordinarily would be admissible as part of the res gestæ. We think such statements come under the well-established rule in this state that, when such declarations accompany the transaction, and are made under such circumstances as will raise a reasonable presumption, they are the spontaneous utterance of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation or design. I. & G. N. Ry. Co. v. Anderson, 82 Tex. 519, 17 S. W. 1039, 27 Am. St. Rep. 902. This law is settled by authorities too numerous to cite. If the ruling of the court in refusing to admit this testimony is error, it is rendered harmless by the facts otherwise showing his negligence and the holding of the court and the instruction of the court in favor of appellee, that the jitney driver was negligent, to which appellee did not object. This proposition is overruled, so is the second, third, fourth, and fifth, which present practically the same error complained of.

[3] The sixth proposition presents the contention that the court erred in excluding the answer of witness Harwick to the question "You may state, as best you can recollect, how the accident happened there," to which the witness answered in part: "The street car was so close to us that there was no chance to avoid the accident." Clearly this was stating a conclusion. That was the very issue for the jury to find. He could have stated the obvious facts; that is, how close the car was, its probable speed, etc., but not that it was, in his opinion, so close upon them "that there was no chance to avoid the

accident." He could only give his opinion on the known facts, as an expert properly qualified to do as in other cases. To the same effect are the objections presented in propositions 6, 7, 8, 9, 10, and 11, and they are all overruled.

[4, 5] The twelfth proposition complains of the action of the court in allowing plaintiff's attorney, while Dr. Berry was testifying, to read from Peterson's book on nervous diseases in the presence and hearing of the jury. To test the medical knowledge of an expert witness on diseases, it is proper to ask him about his knowledge of proven standards and recognized authorities on the subject under investigation. It was proper to ask the witness whether or not he agreed or disagreed with Church-Peterson's statements in their accepted work on nervous diseases. Testimony of the same character from Butler's works and from Church-Peterson's book had been admitted without objection by appellant before the excerpts from Butler's works were read. This rendered the matter harmless if the same had otherwise been error.

Any of this expert testimony or the learned discussion of the doctors on the same subject goes over the head of the average juryman, to say nothing of the lawyers and laymen. The object of securing these technical witnesses is to simplify the subject, so that the jury may discover and understand the nature and the result of the injuries received. Much latitude is given to such an investigation and such portions of scientific and medical books as relate to the subject may be read in the hearing of the jury.

The true rule to be followed is set out in Gulf, C. & S. F. Ry. v. Farmer, 102 Tex. 240, 115 S. W. 262, opinion delivered by Chief Justice Gaines, in which he says:

"During the course of the trial, while Dr. Turner, as an expert witness, testified in behalf of the plaintiffs and had given his opinion as to whether Mrs. Farmer had died as a result of the injuries received, he was asked by counsel for the defendant in regard to his familiarity with certain treatises and medical books, giving the names of the books and authors, and whether they were of good authority or not, and also whether he agreed to the views so laid down. This testimony was objected to on the ground that it was hearsay and immaterial. The court ruled that he could ask the questions, giving the language of the book, but that he should not give the name of the author. The court seems to have proceeded upon the idea that the reading of the authority and naming the author was making it evidence for the jury. In this we cannot agree. As was said by the court in Egan v. Dry Dock R. R. Co. (12 App. Div. 556), 'the reference to books in such cases is not made for the purpose of making the statements in the books evidence before a jury, but solely for the purpose of ascertaining the weight to be given to the testimony of the witness.' If in any aspect of the case the jury could look upon it as evidence, this difficulty could be overcome by instruction that it was not to be so considered. The question was not evidence and therefore we cannot see how it could be objected to as being hearsay. Upon the question of the admissibility of the answers as propounded by counsel for the defendant, there is some conflict and some contrariety of opinion, but there is very eminent authority that holds that the question as propounded is admissible. The purpose of the testimony sought to be elicited is to test the knowledge of the so-called expert and to determine the weight of his testimony, and it seems to us that no better way could be devised for doing this than to take the accepted authorities upon the subject and to see how his knowledge of the matter corresponds with that of such authorities. The following cases seem to recognize the propriety of the question: Hess v. Lowrey, 122 Ind. 225; Egan v. Dry Dock R. R. Co., supra; City of Ripon v. Bittel, 30 Wis. 614; City of Bloomington v. Shrock, 110 Ill. 219; Hutchison v. State, 19 Neb. 262; Pinney v. Cahill, 48 Mich. 584. In such a case we think the testimony should be confined to the purpose of a cross-examination; that is, of showing such deficiency in the knowledge of the expert as to the science about which he is testifying as is calculated to impair the weight of his testimony before the jury."

The object here was to test the witness, and we see no error committed in the several rulings of the court thereon.

Propositions 15, 16, and 17 attack the court's action in submitting questions 1, 2, and 3 on the ground of lack or insufficiency of evidence to establish excessive speed. We have examined the testimony on the subject and it is clear that appellant was moving at an excessive rate of speed when the collision occurred. We overrule these assignments.

[6] We do not think there is any merit in the fifteenth proposition and it is overruled, because there is no error in the first question submitted to the jury, viz.: "Was the motorman in charge of the defendant San Antonio Public Service Company's street car, immediately prior to the accident, operating said car at a dangerous and excessive rate of speed?"

The sixteenth proposition complains of question No. 2: "Did the fact that the said street car was operated at a dangerous and excessive rate of speed (that is, in case you find it was so operated) constitute negligence on the part of the motorman operating the same?" And the seventeenth proposition complains of the third question: "Did such negligence, if any, directly cause or contribute to the accident?"

We see no error presented by questions 1, 2, and 3 of the court's charge. There was ample testimony to justify giving the charges, and the charges are in proper and legal form to submit the issues. The questions were all answered favorably to appellee.

[7] Propositions from 18 to 22 all charge misconduct of the jury in returning a quotient verdict.

There was much testimony introduced on this motion. It is not very different from the average discussions of jurors anxious to come to a correct conclusion, each one contending for his position and views before writing their verdict. Naturally there is often a great difference as to what the verdict should be and much latitude is given to them. They are entitled to thresh it out the one with the other. After the jury had balloted a long time, the foreman suggested that an average be ascertained. One of the jurors testified:

"It was not understood right in the beginning that that would be the verdict regardless of what the amount was, but he wanted to do that to get a little closer together."

In fact, the average was $22,500, and the jury failed to agree on this sum and continued to ballot "some more and it stood for a while between $20,000 and $22,500." Then "some one suggested that we split the difference, and finally that was done and we agreed on this: And we all agreed then we would render that verdict, as the amount Mr. Alexander ought to have. We all agreed to that."

This view is supported by practically all the jurymen who testified. Only seven jurors were called to testify. Some of the jurymen thought the verdict should be divided so that Lozano must pay most of it and the Public Service Company only a small part. They went so far as to ask the court if that could be done, and the court instructed them it could not be done. Then the jury got together on the final amount, wrote the verdict, agreed upon and returned it into court. The verdict was not a quotient verdict and there is no evidence to support the contention that it was improperly returned or that it is excessive.

[8] The plaintiff, Alexander, testified that, about the time of the accident, he "was averaging better than $300 a month," or $3,-600 per annum. Plaintiff had a life expectancy of 30.35 years. He was a healthy, skillful mechanic at the time of his injury. E. L. Kloss, plaintiff's foreman at the International & Great Northern shops, under whom he worked "for about three years," says that plaintiff "worked eight hours regular and did quite a bit of overtime." He "frequently did two shifts." F. A. Carlson, the former master mechanic for the International & Great Northern Railroad, testified that the plaintiff was earning 77 cents per hour, and worked eight hours a day, and was paid "time and a half for overtime; he done some overtime work." His earning capacity is completely destroyed. Dr. Dinwiddie testified:

"Knowing the history of the case, I consider him permanently paralyzed; he will never get his legs back enough to use—the use of his legs back, nor his bladder; he will never get the use of his legs or bladder back again."

A very thorough examination convinces us that there is no reversible error shown.

All assignments are overruled, and the judgment of the trial court is affirmed.