### JOHN G. HARRIS v. THE STATE.

No. 15747.   Delivered March 15, 1933.
Reported in 58 S. W. (2d) 513.

The opinion states the case.

*Sid Crumpton,* of Texarkana, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CALHOUN, JUDGE.—Conviction is for murder; punishment, 50 years in the penitentiary.

The state's testimony showed that the appellant and deceased were seen to go in a cafe in Mount Vernon, Texas, on the night of March 12, 1932. The testimony showed that the deceased was a man around 55 years of age, and about five feet, four inches, tall and weighed about 120 pounds, and the appellant was a much larger man and weighed about 190 pounds. The appellant and deceased ate supper together in said cafe, and the deceased paid for it. They were there about 30 minutes. The supper amounted to about 60 cents, and in payment therefor the deceased produced a twenty dollar bill and was given the balance after deducting the amount of the meal check. At the time the deceased received the change for the twenty dollar bill, the appellant remarked to the deceased that he had better get a basket to tote it in. They then drove off in a Ford coupe. The testimony further showed that the next morning one West Roach was walking along the public highway near Bassett, about 50 miles from Mount Vernon, and saw where something had been dragged off from the north side of the highway. Upon investigation, he found the body of the deceased lying on his face about 65 or 70 feet from the highway. Where the body was found there was some timber and brush. The witness then notified a Mr. Faulkner, who went back with the witness to the place where the body was found. There they found a tire tool, a piece of steel about 10 or 12 inches long, and they also found a jack handle on the edge of the asphalt which was about one inch wide and ten or twelve inches long. Upon an examination of the body of the deceased, it was found that he had two suits of clothes on. The

pockets of all the clothing, with the exception of the pocket that was lying under the body of the deceased, were turned wrong side out. There were several wounds upon the head of the body of the deceased, and there was also found about three puddles of blood. Marks were also discovered where something had been dragged from the south side of the highway across the highway. Off the edge of the highway on the road there was some mud and water, and there were some marks through the mud and water. It was about 8 feet across the mud and water. There were signs showing where the body had been dragged through the mud and water. There was a path leading from said mud puddle right up to the body of the deceased. Mud and water was also found on the deceased's clothing. The pocket of deceased's clothing lying under his body was found to contain $19.30. The testimony further showed that both of deceased's shoes were pulled off, and his shoes were found three or four feet from deceased's body. The evidence further showed that the skull of deceased was fractured in several places. There were wide gapping wounds which went to the brain. About a week after the body of the deceased was found, the appellant was apprehended in Jonesboro, in the state of Arkansas. After the appellant was arrested, he showed the officers where he had thrown the license plates he had taken off the car and the license plates corresponded with the plates that had been issued in California.

A written confession of the appellant was offered in evidence by the state, which was to the effect that the appellant had ridden with deceased in deceased's car from California to Mount Vernon. After they had left Mount Vernon, the deceased was driving the car and appeared to be sleepy, so they stopped the car by the side of the road and went to sleep; that he was awakened by the deceased trying to take his privates out of his pants, and he further stated: "When I woke up I found him with his head down between my legs, his body under the steering wheel and his feet on the gound on the left side of the car, that is, his feet were either on the ground or on the left fender. Anyway the left door was open and part of his body was out of the car. He had my privates out and in his hand. I reached back on the shelf back of the seat and grabbed a jack with one hand and a tire pump with the other hand. I had the jack in my left hand and hit him in the back of the head with it. I also hit him over the head with the pump before I got out of the car. I then got out on the right hand side of the car and threw the pump away but kept the jack."

Appellant further admitted that the deceased got out of the

car and fled from him and he followed the deceased into a ditch filled with water and there stomped him and struck him over the head some more with the jack. He then grabbed deceased by the coat collar and dragged him through the mud and water until he got him on the ground, and he then decided that he had gone so far with him that he better finish him up, so he hit him several more times with the jack and then threw the jack down. He further stated in said confession that he then searched the deceased's pockets for his, the appellant's purse which deceased had, but, before searching his pockets, he pulled his shoes off to see if his purse was in his shoes. He testified that he found his purse and also found deceased's money, but did not take it. He then left the body of deceased lying there and got in the car and came to Texarkana and left the car there; that he took the license plates off of the rear of the car and threw them away; that the front license plate had been lost in Arizona. He then went to the yards of the Missouri Pacific railroad and caught a freight train into Little Rock.

The appellant testified in his own behalf, and testified to the facts substantially as those contained in his confession, with the exception that in his testimony he stated that he acted in self-defense, in that at the time he struck the deceased he had reason to believe the deceased was going to maim him; that deceased had had a knife, and deceased would not let the appellant have the knife on the trip in order to patch a tire, and, when he struck the deceased, he was fighting for his life. He further testified that he had been bothered ever since he was a boy with convulsions, and at the time he struck the deceased he was hysterically fighting for his life, and he didn't know whether or not the deceased had his knife. He could not see the deceased's knife, but he knew that the deceased had a knife which was large enough to kill.

The apellant challenged the array of the venire on two grounds: First, that Josey Eldridge, one of the jury commissioners, at the time he acted as jury commissioner had a civil suit pending in the civil court; and, second, that said Eldridge was under indictment for a felony in the circuit court of Pulaski county, Arkansas, at the time he served as commissioner. Article 2104, Revised Statutes, names five qualifications for jury commissioners; the fourth qualification is that he shall have no suit in said court which requires the intervention of a jury. By article 333, Code of Criminal Procedure, four qualifications are set forth for a jury commissioner, the fourth of which is identical with that contained in article 2104, Revised Statutes. In neither the civil statutes nor the Code of

Criminal Procedure is there any provision of law which disqualifies a jury commissioner because he is under indictment for a felony at the time he served. Article 608, Code of Criminal Procedure, provides for the only ground for a challenge to the array in a capital case, that ground being that the officer who summoned the jury has wilfully summoned jurors with a view to securing a conviction or acquittal, and by the last sentence of that article it is also provided that this article shall not apply when the jurors summoned have been selected by jury commissioners. In the case of Whittle v. State, 66 S. W., 771, a motion was made to quash the array of jurors on the ground that one of the commissioners was a party to three civil suits pending in court at that time which suits required the intervention of a jury. The question was squarely presented before the jury was impaneled, and it was held in substance that a challenge to the array of jurors is not allowed, unless it has been shown that the jury commissioners acted corruptly in drawing the list of jurors for the purpose of securing the conviction of the defendant. The statute providing for qualifications of commissioners is held to be directory and not mandatory.

In the case of Walker v. State, 267 S. W., 988, a motion was made to quash the venire, which the court held was in reality a challenge to the array of jurors. The ground of the motion was that one of the jury commissioners had a suit pending in the district court which required the intervention of a jury. The Whittle case, supra, and the case of Bryant v. State, 260 S. W., 598, were cited, and were held to be directly in point as authority against the contention that the venire should be set aside. And, in further discussion of the question, it was held that the statute (what is now article 608, C. C. P.) names the only ground for a challenge to the array, and that this statute explicitly denies the right to challenge the array when the jurors have been selected by jury commissioners. See, also, Dailey v. State, 55 S. W., 831; Williams v. State, 75 S. W., 861.

It will be observed that none of the statutory provisions relating to qualification of commissioners say anything about whether or not he is under indictment for a felony. There being a total absence of proof that the jurors were corruptly drawn for the purpose of obtaining a conviction of the defendant, and this court having held that the statute defining the qualification of a jury commissioner is directory and not mandatory, we feel constrained to hold that the decisions of this court settle the issue involved adversely to the contentions of

the appellant, and that there was no error in the action of the district court in overruling the challenge to the array.

By bills of exception 2, 3, 4, and 5, appellant claims that the trial court committed error in permitting the testimony on the trial of the case of three doctors as to their examination of the defendant when he was in custody and as to their opinion as to whether the appellant was subject to any kind of convulsions or fits, and as to the eliciting from the appellant on cross-examination the following testimony: That he had been having these convulsions for a number of years and he had had convulsions last year, and as to whether or not a fellow prisoner by the name of Leo Posey hadn't told the appellant that he could get out of the case by throwing fits, and if the appellant didn't immediately begin to throw fits and asked the said Posey how to do it, and other questions as to his conduct in regard to said fits while in jail. Defendant objected to all of said testimony because the appellant was in the custody of officers and no proper predicate had been laid for such information and it was inadmissible for any purpose and the questions asked in reference to his sanity or his physical condition and mental condition, not being an issue in the case, were highly prejudicial and injurious to the defendant.

All of said bills are qualified by the trial judge, without any exception thereto by the appellant, to the effect that said cross-examination and testimony was admissible because defendant had on direct examination been questioned by his attorney, and he had testified that he had been nervous and had had spells and convulsions when he was a boy, and he didn't know what he was doing at the time he killed the deceased, and the testimony complained of as to the defendant's testimony was on cross-examination of the defendant upon this issue made by his testimony given on direct examination, and the court gave the defendant the benefit of this issue in his charge to the jury. The appellant having testified on his direct examination, as shown by the court's qualifications to the bills, that he had been nervous and had had spells and convulsions to such an extent that at times he didn't know what he was doing and he was in that condition at the time he killed the deceased, the question of whether the appellant was subject to spells and convulsions to such an extent that at times he didn't know what he was doing and he was in that condition at the time he killed the deceased became a material issue in the case as to whether he was subject to said spells and convulsions. We quote from Branch's Ann. P. C., sec. 97, p. 52, as follows: "Whatever material facts are introduced that tend to affect the

issue, the other side has the right to deny, contradict or explain that testimony, showing its falsity, or breaking its force and effect in any legitimate way." Johnson v. State, 167 S. W., 733; Swafford v. State, 171 S. W., 225. No reversible error is shown by these bills.

Appellant also contends that the court erred in his charge to the jury in merely charging the jury the abstract definition of exculpatory statements in confessions, and that the appellant was entitled to an affirmative charge on such statements, and the jury should have been required to return a verdict of not guilty if such exculpatory statement introduced by the state had not been disproved. The court in his charge to the jury used the following language: "In this case the State has introduced in evidence a confession of the defendant, and the State is bound by any and all statements therein made until and unless the State has proven the falsity of the same by other evidence beyond a reasonable doubt." In addition to said charge, the court charged on self-defense as claimed by appellant both in his confession and in his testimony.

We quote from the opinion of Presiding Judge Morrow in McKinley v. State, 104 Texas Crim. Rep., 65, as follows: "Ordinarily, when the State introduces a confession of accused containing exculpatory statements, it is incumbent upon the court to instruct the jury that the exculpatory statements are regarded as true unless disproved. Maxey v. State, 58 Texas Crim. Rep., 121; Winkler v. State, 58 Texas Crim. Rep., 568; Jackson v. State, 55 Texas Crim. Rep., 86; Gaines v. State, 58 Texas Crim. Rep., 639; Banks v. State, 56 Texas Crim. Rep., 265. This rule, however, has been relaxed in a case where the accused on trial testifies and his testimony before the jury is in accord with the exculpatory features of his confession, and his defensive theory arising from his testimony and coinciding with the exculpatory theory advanced in the confession is fairly submitted to the jury. See Casey v. State, 54 Texas Crim. Rep., 584."

There was nothing in the court's charge that was calculated to lead the jury to understand that the exculpatory statements in said confession could not be considered for any purpose favorable to the appellant. The appellant's defensive theory arising from his testimony and coinciding with the exculpatory theory advanced in the confession was by the court fairly submitted to the jury. No reversible error is shown.

Three special charges appear in the record, two of which were refused. No exceptions seem to have been saved to this action of the court. It does not so appear from any notation

on the special charges, over the court's signature, but only a notation that it was refused. It has been repeatedly held that it must be made to appear affirmatively that exceptions were reserved to the refusal of special charges before they were properly before us for review. Section 65, Tex. Juris., vol. 4; Cunningham v. State, 97 Texas Crim. Rep., 624, 262 S. W., 491; Craven v. State, 93 Texas Crim. Rep., 329, 247 S. W., 515; Linder v. State, 94 Texas Crim. Rep., 316, 250 S. W., 703; Hickman v. State, 93 Texas Crim. Rep., 407, 247 S. W., 518.

Finding no error in the record which would authorize a reversal, the judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.